Daniel **IMMEDIATO**, a minor, by Diane and Eugene **IMMEDIATO**, as Guardians, and in their own right, et al., Plaintiffs,

v.

**RYE NECK SCHOOL DISTRICT;** Kathleen D. Gulotta, Frank Spedafino, Beatrice Cerasoli, Alan Manocherian, Janice K. Anderson, Liz Perelstein, in their official capacities as members of the Rye Neck School District Board of Education; and Peter J. Mustich, in his official capacity as Superintendent of Rye Neck School District, Defendants.

No. 94 Civ 2831(CLB).

United States District Court, S.D. New York.

Jan. 19, 1995.

Scott G. Bullock, Institute for Justice, Washington, DC, for plaintiffs.

Lance J. Gotko, New York City, for plaintiffs.

Phyllis S. Jaffe, Plunkett & Jaffe, White Plains, NY, for defendants.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

Plaintiffs, Daniel Immediato, a Rye Neck high school student and resident of Mamaroneck, New York in this district, together with his parents, Diane and Eugene Immediato, filed this action pursuant to 42 U.S.C. § 1983 challenging the constitutionality of a mandatory community service program ("the Program"), described below, established by Defendants Rye Neck School District and Board of Education. Plaintiffs contend that the Program violates the students' rights under the Thirteenth and Fourteenth Amendments, as well as the parents' rights to direct the upbringing and education of

their children under the Fourteenth Amendment of the United States Constitution.

Pursuant to Fed.R.Civ.P. 56, all parties move for summary judgment. An amicus brief in support of Defendants was filed by the American Alliance for Rights and Responsibilities, a national public interest group with experience in the area of community service programs.

The facts set forth below are conceded to be true, or assumed to be true for purposes of these motions.

Defendant Rye Neck School District is a Union Free School District established by the resident electors pursuant to New York State Education Law. It operates a high school, located in Mamaroneck, New York, which has a current enrollment of 278 students, grades 9 through 12. In 1990 the Rye Neck Board of Education, consisting of members elected by the parents and residents of the district, expressly voted to establish a mandatory community service program in the high school. Commencing with the graduating class of 1992, students in grades 9 through 12 would be required to perform 40 hours of "community service" during the four high school years as a condition of graduation ("the Program").

Students may not receive pay for their services. The required service must be performed "with people in need—people who are poor, homeless, handicapped, or in need of education, supervision, or companionship." Exh. C–1 to Joint Statement of Material Facts. Students may work with not-for-profit corporations, sectarian and non-sectarian charities, public agencies or political organizations. Many organizations request service through announcements and bulletins posted at school. Students may suggest other agencies or organizations for which to perform service, but the nature of such service must be pre-approved by the school coordinators of the Program in order for students to gain credit for their work.

Half of the required 40 hours can be provided in the form of voluntary service to the Rye Neck School District or to younger students within the District during the school day. A minimum of twenty hours of service, however, must be performed outside the high school.

Students may perform the service at any time during the four high school years, including during the summer. Students may establish their own work schedule by agreement with the recipient agencies or organizations. Any training or necessary supervision of the students is provided by the agencies or organizations, not by the school personnel. After the service is completed, the students must submit to the school verified time sheets which document the number of hours worked.

As part of a required senior year classroom course entitled, "Managing Your Future," all students must complete a questionnaire/form asking "where, when, and what" they did, what they gained from the service, and whether there was "any career connection." Exh. B to Joint Statement of Material Facts. Also as a part of the required course, students discuss in the classroom with the teacher and their fellow students where they performed their service, the type of work they did, and what they gained from their experience. Students are not required to disclose why they selected the particular community service or whether or not they agree with the aims of the particular agency or organization.

While the course itself is graded Pass–Fail, if the community service hours are not completed, the student will be ineligible for graduation. The Program makes no provision for students or parents who object to mandatory community service and seek to opt out of the Program or to be relieved from its obligations.

It was disclosed at the hearing before this Court, held on November 10, 1994, that Plaintiffs in this case have not petitioned the Commissioner of Education of New York State for an exemption from the requirement. However, Commissioner Sobol on March 13, 1990, in an administrative appeal from a very similar program having the same title, established in 1987 by the adjoining City of Rye (New York) School District, held that such a program was "not arbitrary, capricious or unreasonable" and found affirmatively that it would "benefit students in their

post-graduate endeavors" and that other school districts should be "encourage[d] ... to pursue this laudable practice." *See Appeal of Anne O'Neill,* Judicial Decision of the Commissioner No. 12,300 (March 13, 1990); Exhibit to Defendants' Memorandum of Law in Support of Motion for Summary Judgment.

Plaintiff Daniel Immediato is currently a student at Rye Neck High School and subject to the mandatory community service requirement as a condition of graduation.[1]

At the outset, the Court notes the tension between the purposes of majoritarian government and the desires of individuals to live unrestricted by government regulations which appear to them to be worthless, the latter implicating a constitutionally protected liberty interest. These forces clash readily in the area of education, where our nation has enjoyed a long history of encouraging families to take responsibility for the instruction of their own children, while at the same time, making school attendance compulsory and granting control of the curriculum to state and local officials.

▪ The late Honorable Frank C. Moore, who served as Lieutenant Governor of New York, a skilled municipal lawyer and later head of the Office of Local Government of the State of New York, was generally regarded as the guardian and protector of the small units of elected local government in New York. Governor Moore preached that "Home Rule is the right to be misgoverned by our friends and neighbors." The goal of local Home Rule is to allow communities to develop rules and regulations for the management—or mismanagement—of their own affairs, through forms of majority rule existing by the very nature of a republican form of government. An individual may disagree with a particular policy or rule implemented by duly elected local representatives within the scope of the responsibility entrusted to them. Ordinarily, that person must abide by the general law while attempting to persuade others in the community to revise the rule, or

to elect new local representatives who will do so.

The United States Supreme Court has recognized the benefits of local responsibility for public education:

> [O]ne of the peculiar strengths of our form of government [is] each State's freedom to 'serve as a laboratory; and try novel social and economic experiments.' No area of social concern stands to profit more from a multiplicity of viewpoints and from a diversity of approaches than does public education.

*San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 50, 93 S.Ct. 1278, 1305, 36 L.Ed.2d 16 (1973) (Powell, J., quoting in part from the dissent of Justice Brandeis in *New State Ice Co. v. Liebmann,* 285 U.S. 262, 52 S.Ct. 371, 76 L.Ed. 747 (1932)). It is "long recognized that local school boards have broad discretion in the management of school affairs." *Board of Education, Island Trees Union Free School Dist. No. 26 v. Pico,* 457 U.S. 853, 863, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982) (Brennan, J.).

▪ In New York, the Board of Education of a Union Free School District may determine initially whether a particular course or program will be established or discontinued. *See* New York State Education Law § 1709(3) ("The said board of education of every union free school district shall have power, and it shall be its duty ... [t]o prescribe the course of study by which the pupils of the schools shall be graded and classified....").[2] The New York State Commissioner of Education, as the chief executive officer of the state system of education, is empowered to enforce all laws relating to the education system of the state. New York State Education Law § 305. In a Union Free School District, the Commissioner is charged with the general supervision of the board of education, and its management and conduct of all departments of instruction. New York State Education Law § 309. A party aggrieved by the official actions of local school officials, including a board of edu-

---

1. Plaintiffs Mario Gironda, Jr. and his parents have withdrawn from the litigation.

2. The local board of education may consist of between three and nine trustees who are elected to serve for three, four or five years. *See* New York State Education Law § 1702.

cation, may appeal for relief to the Commissioner of Education, pursuant to New York State Education Law § 310(7). That right to appeal to the Commissioner of Education supplements but does not preclude redress from a court in the proper case where the plaintiffs allege violation of their Constitutional rights. *See Plano v. Baker*, 504 F.2d 595 (2d Cir.1974); *Jacobson v. Board of Ed. of City of New York*, 177 Misc. 809, 31 N.Y.S.2d 725 (Sup.Ct. Kings County 1941), *modified on other grounds*, 265 A.D. 837, 37 N.Y.S.2d 647 (2d Dept.1942), *appeal denied*, 265 A.D. 935, 39 N.Y.S.2d 416 (2d Dept.1942). Ordinarily the Commissioner does not address Constitutional issues, but he is free to do so.

It is undisputed that the Board of Education of Rye Neck Union Free School District consists of duly elected officials with authority to establish a curriculum for Rye Neck High School. The New York State Department of Education has approved an optional syllabus for a course comprised of community service. *See Appeal of Anne O'Neill*, Judicial Decision of the Commissioner No. 12,300, at 297. In developing its own curriculum, Defendant Rye Neck Board of Education chose to implement the state syllabus.

■ Clearly, this Court may grant relief only on a clear showing that *as applied*, the Program violates the Constitutional rights of these Plaintiffs. We are not concerned here with a possible violation of the Constitutional rights of some other student which might be hypothesized. Nor are we concerned with the wisdom or utility of the Program, which may well seem to some to have Orwellian overtones, or be less useful to the graduates than a foundation course in Latin or English Grammar.

### Thirteenth Amendment

Plaintiffs must show infringement of a specific right secured by the Constitution. We consider first, Plaintiffs' claim that the Thirteenth Amendment has been violated. That Amendment provides:

Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

U.S. Const. amend. XIII, § 1.

Ratified in 1865, in fulfillment of the Reconstruction goals of the victorious Union, the Thirteenth Amendment had the specific purpose of eliminating African slavery. The Supreme Court has explained that, "the phrase 'involuntary servitude' was intended to extend 'to cover those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results.'" *United States v. Kozminski*, 487 U.S. 931, 942, 108 S.Ct. 2751, 2759, 101 L.Ed.2d 788 (1988) (*quoting Butler v. Perry*, 240 U.S. 328, 332, 36 S.Ct. 258, 259, 60 L.Ed. 672 (1916)).

In *Pollock v. Williams*, 322 U.S. 4, 64 S.Ct. 792, 88 L.Ed. 1095 (1944) and *Bailey v. Alabama*, 219 U.S. 219, 31 S.Ct. 145, 55 L.Ed. 191 (1911), the Supreme Court struck down state peonage laws that subjected debtors to criminal punishment for failing to perform labor to discharge a debt. In *Kozminski*, the Court held that involuntary servitude was present, warranting prosecution under 18 U.S.C. § 241 and 18 U.S.C. § 1584, when the defendants, not acting under color of any law, forced two mentally retarded men to perform labor on a dairy farm without pay under squalid and highly abusive conditions. This was accomplished through "physical and verbal abuse for failing to do their work." 487 U.S. at 935, 108 S.Ct. at 2755.

■ *Kozminski* represents a high water mark in Thirteenth Amendment jurisprudence. Not all legally compelled service is prohibited by the Thirteenth Amendment.[3] Governments may require involuntary performance without compensation of well-established civic duties. *See Hurtado v. United States*, 410 U.S. 578, 589 n. 11, 93 S.Ct. 1157, 1164 n. 11, 35 L.Ed.2d 508 (1973) (jury service); *Selective Draft Law Cases*, 245 U.S. 366, 390, 38 S.Ct. 159, 165, 62 L.Ed. 349 (1918) (military service); *Butler v. Perry*, 240 U.S. 328, 333, 36 S.Ct. 258, 259, 60 L.Ed. 672

---

3. In *Kozminski* the forced labor was not legally      compelled.

(1916) (work on local public roads). The purpose of the Thirteenth Amendment never included interference with the state's power to compel its own citizens to fulfill essential civic obligations. *Butler*, 240 U.S. at 333, 36 S.Ct. at 259.

Our Court of Appeals has concluded that a mental institution may compel a lawfully committed mental patient to perform housekeeping chores or other labor as part of a therapeutic program where the assumed benefit to the patient outweighs the incidental burden of the labor requirement, without violating the Thirteenth Amendment. *Jobson v. Henne*, 355 F.2d 129, 131–32 & n. 3 (2d Cir.1966). However, the same Court also has held that involuntary servitude may exist in "some mandatory programs so ruthless in the amount of work demanded, and in the conditions under which the work must be performed, [so as to be] devoid of therapeutic purpose." *Id.* at 132.

■ It cannot be contended in the instant case that the Program is so ruthless or devoid of educational purposes. The amount of service required, an average of 10 hours per year, and the flexible conditions under which the service can be performed, do not appear to be ruthless. A reasonable educator could conclude that the program teaches a variety of "real world" skills such as cooperation, organization and communication with others. The Rye Neck Board of Education reasonably could conclude that the benefit to the individual student outweighs the incidental burden of the labor requirement.

Furthermore, this case does not involve the type of physical force or legal sanction present in Supreme Court decisions finding involuntary servitude. The Program does not threaten the students with physical pain, imprisonment or fines. Plaintiffs argue that increased usage of community service programs by the state and federal courts as sentencing alternatives for criminals in order to teach basic work skills and job discipline, as well as to punish, has established that community service is an inappropriate aspect of a school curriculum because such service now has become penal in nature or has acquired some aura of shame or disgrace by association. This Court concludes that any such transferred opprobrium has not been shown to exist in the public perception of student community service.

In *Steirer v. Bethlehem Area School Dist.*, 987 F.2d 989 (3d Cir.1993), the court concluded that a similar mandatory community service program did not constitute involuntary servitude. After considering Supreme Court and Circuit Court decisions, the *Steirer* court adopted a "contextual approach to involuntary servitude by confining the Thirteenth Amendment to those situations that are truly 'akin to African slavery.'" *Id.* at 1000. The court held that "[t]here is no basis in fact or logic which would support analogizing a mandatory community service program in a public high school to slavery." *Id.* This Court accepts that view, but in doing so we rely on the continued existence of the right to petition the local officials for an exemption or limitation of the Program, and the retained right, if Plaintiffs and a majority of their neighbors find the Program too oppressive, to "throw the rascals out" at the next school board election.

### Parental Rights under the Fourteenth Amendment

Plaintiffs contend alternatively that the Program interferes with the Constitutional right of parents to direct and control the upbringing and education of their children.[4] Plaintiffs argue that "the decision to help others must always come from one's conscience and through self-motivation." Plaintiffs' Memorandum in Support of Motion for Summary Judgment 23. This statement may be self-evident as a matter of philosophy. But nowhere is it found in the Constitution.[5]

---

4. As admitted in their Memorandum of Law, the parents in this case do not object to the Program on religious grounds. Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment 9.

5. According to the Immediatos:

We have taught our children through both word and example that to do good for others, without being asked or told and without compensation, is its own reward ... But never have we told our children that they must, or are obligated, to help others. That would defeat all we have tried to impart to them over

■ Plaintiff parents allege that they possess a Constitutional right to "have their children opt out of programs that are contrary to the beliefs and values they seek to impart." *Id.* at 22. We find no federal caselaw which recognizes a constitutionally protected parental right for students to opt out of an educational curriculum for purely secular reasons. *Cf. Alfonso v. Fernandez,* 195 A.D.2d 46, 606 N.Y.S.2d 259 (2d Dept. 1993) (issue of parental control over health care, involving distribution of free condoms in schools), *appeal dismissed without op.,* 83 N.Y.2d 906, 614 N.Y.S.2d 388, 637 N.E.2d 279 (1994). Where the United States Supreme Court has considered the constitutionality of school regulations in light of parental challenges pursuant solely to the Fourteenth Amendment, the relevant inquiry is whether the regulation has a reasonable relation to some end within the competency of the state. For example, in *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), the Supreme Court struck down a state law which prohibited the teaching of German in schools. The Court stated that "the statute as applied is arbitrary and without reasonable relation to any end within the competency of the State." *Id.* at 403, 43 S.Ct. at 628. In *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), the Court held unconstitutional a state law requiring all children to attend public schools through high school, and recognized the right of parents to send their children to a nonpublic school. Writing for the Court, Justice McReynolds enunciated the oft-repeated statement: "The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.* at 535, 45 S.Ct. at 573. The Court found that the state regulation *"unreasonably* interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control" and that such rights "may not be abridged by legislation which has no reasonable relation to some purpose within the competency of the State." *Id.* at 534–35, 45 S.Ct. at 573 (emphasis added).

The Court in *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), explained that secular claims for exemption from general laws have a different status than religious claims for exemption. The *Yoder* Court noted, "A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations." *Id.* at 215, 92 S.Ct. at 1533. Rather, "when the interests of parenthood are combined with a free exercise claim ..., more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment." 406 U.S. at 233, 92 S.Ct. at 1542.

Parents may have "value" based secular objections to many subjects, such as sociology, literature, or biology and will be tempted ultimately to seek intervention by the federal courts to have their children exempted from various classes, exercises, examinations, or activities, in a curriculum established, as in this case, by their duly elected board of education. No public policy will be served by this Court usurping the legitimate authority of school officials to perform their duties in educating citizens; to attempt to do so, because we, or Plaintiffs consider the Program undesirable on purely secular grounds would wreak havoc in the administration of the schools, and involve the federal judiciary impermissibly in matters of local Home Rule.

The issue, therefore, is whether the Program has a reasonable relation to an end within the competency of the state. It is well settled that "a State, having a high responsibility for education of its citizens, [has power] to impose reasonable regulations for the control and duration of basic education." *Yoder,* 406 U.S. at 213, 92 S.Ct. at 1532. The Supreme Court also has noted the "power of the State to ... make reasonable regulations for all schools," and "the State's power to prescribe a curriculum for institutions which it supports." *Meyer,* 262 U.S. at 402, 43 S.Ct. at 627.

■ The evidence submitted on these motions shows that the Program is aimed at

the years about serving others and consequently destroy any moral value in serving others.

Plaintiffs' Memorandum in Support of Motion for Summary Judgment 23.

teaching skills and habits perceived by Defendants as essential for good citizenship. The Program, we are told, "allows students to develop a wide range of personal, intellectual, academic and social skills—such as teamwork, problem-solving, negotiation, communication, planning, and evaluation—that will help them become effective employees, colleagues, citizens, and leaders." Bradley Aff. ¶8; Attached to Amicus Curiae the American Alliance for Rights and Responsibilities' Memorandum in Support of Defendants' Motion for Summary Judgment. If a reasonable person could conclude on the evidence available, or merely by inductive reasoning, that this is really true, and we hold that a reasonable person could so find, then these goals and the Program to effectuate them have a reasonable relation to purposes within the competency of the State. See Meyer, 262 U.S. at 403, 43 S.Ct. at 628; Pierce, 268 U.S. at 535, 45 S.Ct. at 573. The appropriate decisionmaker of whether to implement a reasonable regulation is not this Court or Plaintiffs. Rather, the Home Rule issue is entrusted by the Constitution and the caselaw to the duly elected trustees of the local boards of education. Their decision can and should be informed by the views of the state Commissioner, supportive in this case, and the wishes of their as yet silent electorate. Plaintiff parents may not use this Court to interpose their own way of life or their own philosophy, however laudable, as a barrier to reasonable state and local regulation of the educational curriculum.

### Student Rights under the Fourteenth Amendment

Plaintiffs contend that the students' rights under the Fourteenth Amendment are violated because the Program requires the students to disclose where they performed charitable service, the type of work they did for the organization, and what they gained from the service.[6] Plaintiffs argue that "a student must either reveal the types of service and organizations he believes

are worthy, or must cloak his true moral judgments as to which causes and organizations are worth his time and labor by choosing those that the government and his classmates will view as acceptable." Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment 13.[7]

This assertion is contradicted at least in part by the wide range of available agencies or organizations for which students may choose to perform service, many of which are neutral, as well as the student's right to propose alternative or additional agencies or organizations. No political, religious or moral association is implied by most of the approved services, which include American Red Cross, Blythedale Children's Hospital, Cafeteria/Hall Assistant, Custodial Assistance, Emergency Medical Services, Home for the Aged of New Rochelle, Mamaroneck Community Nursery School, F<E<Bellows Pizza Day Help, March of Dimes Birth Defects Foundation, New Orchestra of Westchester, New Rochelle Hospital Medical Center, OPUS—Organization of People Undaunted by Stroke, Port Chester Nursing Home, Sunnydale Senior Citizen Home, Tutoring, United Hospital, Volunteers in Archives, West. Lighthouse for the Blind, Westchester County Medical Center, Westchester Developmental Disabilities Service Office. See "A Sampling of Community Service Options," Ex. C–2 to Joint Statement of Material Facts. A student may perform all forty hours of service for "neutral" agencies and organizations. Under these circumstances, the limited information to be disclosed in the questionnaire/form and class discussions would not seem to force students to reveal or suppress moral judgments. See Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) (prohibiting disclosure of every organization to which teacher belonged or regularly contributed within five years as scope of inquiry was completely unlimited). Elective choices a student makes, such as choosing one foreign language over another, or selecting a project, book or subject for a paper, often may involve indicia of personal prefer-

---

6. Plaintiffs do not claim that the Program violates their First Amendment rights to freedom of speech.

7. If on occasion a high school student must cloak his or her true moral judgments by expressing in

class views which are insincere but politically correct and likely to gain favor with the teacher, it would indeed be regrettable but not actionable under the Fourteenth Amendment.

ence or opinion. This does not implicate a privacy interest worthy of Constitutional protection. This Program as administered does not seem in practical reality to require students to reveal information or beliefs protected by the Fourteenth Amendment.

### Abstention

■ Defendants urge *Burford* abstention.[8] However, in order to determine the constitutionality of the Program, this Court need not analyze any disputed issues of state law. There are no factual determinations of state agencies or courts at issue. *See Alliance of American Insurers v. Cuomo*, 854 F.2d 591, 601 (2d Cir.1988) (*Burford* abstention held inappropriate). That state courts are also capable of deciding the constitutional issues raised does not, in and of itself, require this Court to abstain from deciding the issues in this case. Accordingly, *Burford* abstention is inappropriate.

For the foregoing reasons, the motion for summary judgment in Defendants' favor is granted and Plaintiffs' motion is denied. Settle a final declaratory judgment on notice or waiver of notice.

SO ORDERED.

---

**8.** *Burford v. Sun Oil Company*, 319 U.S. 315, 63   S.Ct. 1098, 87 L.Ed. 1424 (1943).