73 F.3d 454
 64 USLW 2443, 106 Ed. Law Rep. 85
 Daniel IMMEDIATO, Diane Immediato, and Eugene Immediato,
Plaintiffs-Appellants,
Mario Gironda, Jr., Mario Gironda, and Sandra Gironda, Plaintiffs,
v.
RYE NECK SCHOOL DISTRICT, Kathleen D. Gulotta, Frank
Spedafino, Beatrice Cerasoli, Alan Manocherin,
Janice K. Anderson, Liz Perelstein,
Peter J. Mustich, Defendants-Appellees.
 No. 189, Docket 95-7237.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 10, 1995.
Decided Jan. 2, 1996.
 
 Scott G. Bullock, Institute for Justice, Washington, DC (William H. Mellor III, Clint Bolick, Institute for Justice, Washington, DC; Lance J. Gotko, New York City, of counsel), for Plaintiffs-Appellants.
 Phyllis S. Jaffe, Plunkett & Jaffe, White Plains, NY, for Defendants-Appellees.
 Thomas A. Bowden, Baltimore, MD; Robert S. Getman, New York, NY, submitted a brief for amicus curiae The Association for Objective Law.
 James F. Bendernagel, Dennis D. Hirsch, Anne K. Adams, Michael J. Raphael, Sidley & Austin, Washington, DC; Robert Teir, The American Alliance for Rights and Responsibilities, submitted a brief for amicus curiae The American Alliance for Rights and Responsibilities.
 Before: NEWMAN, Chief Judge, McLAUGHLIN and LEVAL, Circuit Judges.
 McLAUGHLIN, Circuit Judge:
 
 
 1
 Daniel Immediato is a high school student in the Rye Neck (N.Y.) School District (the "District"). He and his parents (together, the "plaintiffs") brought an action pursuant to 42 U.S.C. Sec. 1983 against the District, the members of the District Board of Education, and the District Superintendent (together, the "defendants"), in the United States District Court for the Southern District of New York (Charles L. Brieant, Jr., Judge ), alleging that the District's mandatory community service program (the "program") violated their constitutional rights. The plaintiffs argued that the mandatory community service program violated: (1) Daniel's Thirteenth Amendment rights; (2) the parents' Fourteenth Amendment rights; and (3) Daniel's Fourteenth Amendment rights. The plaintiffs requested declaratory and injunctive relief. The district court granted summary judgment for the defendants.
 
 
 2
 Plaintiffs now appeal, renewing the arguments raised below. We hold that the District's mandatory community service program does not violate the plaintiffs' constitutional rights, and thus affirm the judgment of the district court. 873 F.Supp. 846.
 
 BACKGROUND
 
 3
 Rye Neck School District's public high school, located in Mamaroneck, New York, has an enrollment of about 275 students in grades 9-12. In 1990, the District instituted a mandatory community service program as part of the high school curriculum. Under the program, in order to earn their diplomas all students must complete forty hours of community service sometime during their four high-school years. They must also participate in a corresponding classroom discussion about their service. The program has no exceptions or "opt-out" provisions for students who object to performing community service.
 
 
 4
 There are rules regarding the organizations to which the students may donate their services, and the nature of the work they may perform. For their efforts to count towards the forty-hour requirement, students may not receive pay for their services, nor may their services displace activities performed by paid employees of the organization being served. Furthermore, while up to twenty hours of service may be provided to the school itself or to younger students at the school, at least twenty hours must be provided to an organization outside the school.
 
 
 5
 Within the boundaries of these rules, the students have a large degree of latitude to choose their organizations. Students, for example, may work for not-for-profit corporations, charities, political organizations or public agencies. Although the school furnishes an extensive list of suggested organizations and of groups that have asked for student help, students remain free to suggest their own charitable organizations. Student proposals must win the approval of the school, but approval is almost always granted. To the best recollection of school officials, only two students have ever been told that their proposed service was ineligible for credit: (1) a student who wanted to work in his father's store; and (2) a student who was to be paid for babysitting.
 
 
 6
 Students may also provide their services to religiously-affiliated institutions, so long as the students' work involves charitable assistance, and not merely promotion of the religion or organization. For example, students may assist a church in feeding or housing the homeless, but will not receive credit for proselytizing.
 
 
 7
 The organizations for which the students work are responsible for any necessary training or supervision. The organizations must document the hours worked by the students, and the students must submit this verified time sheet to the school. Students may perform their forty hours of service at any time over their four high school years, including the summers when school is not in session. Students set their own work schedules and provide their own transportation.
 
 
 8
 As part of a required senior-year course ("Managing Your Future"), students must complete a short form documenting and summarizing their community service. Listing where, when, and how they performed their service, students must also state what they "gained" from their experience and whether their service had any "career connection" for them. The form does not ask why they chose the particular organization or whether they agreed with its goals. After completing the form, the students discuss their service with the teacher and other students. This discussion is limited to the information on the form. The program is graded on a pass-fail basis, and students are required to meet certain benchmarks (e.g., 10 hours) by the end of each quarter of their senior year to pass.
 
 
 9
 Daniel Immediato, a student at the District's high school, objects to the mandatory community service program. He believes that charitable activities and community service, while admirable, must be left to an individual's conscience, and should not be mandated by the school. He also desires to keep private any information about what community service he does or does not perform. Daniel's parents, co-plaintiffs, concede that community service is rewarding, but maintain that it must remain a matter of individual choice. They have tried to instill these values in Daniel, but fear that the school's mandatory community service program will instead teach him that guidance on moral issues should come from the government, rather than from within.
 
 
 10
 Daniel and his parents filed a complaint against the District and several of its officers. They contend that the mandatory community service program conditions the right to public education on the surrender of their constitutional rights. Specifically, they assert that the program: (1) imposes involuntary servitude upon Daniel, in violation of the Thirteenth Amendment; (2) infringes on Daniel's parents' Fourteenth Amendment right to direct his upbringing and education; (3) infringes on Daniel's personal liberty, in violation of the Fourteenth Amendment; and (4) violates Daniel's right to privacy, in violation of the Fourteenth Amendment. The plaintiffs asked the district court to declare the program unconstitutional, and to permanently enjoin the defendants from imposing the program. The defendants denied that the program violated any of the plaintiffs' constitutional rights, and argued that, in any event, the district court should abstain from hearing the case under Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) (a federal court should abstain from hearing complex state-law questions bearing on substantial policy issues).
 
 
 11
 After limited discovery, the parties agreed that there were no disputed issues of material fact, and submitted a Joint Statement of Material Facts. The parties also filed motions for summary judgment. On January 19, 1995, the district court issued a thorough memorandum and order granting summary judgment for the defendants, and denying the plaintiffs' similar motion. Immediato v. Rye Neck School District, 873 F.Supp. 846 (S.D.N.Y.1995). The court held that Burford abstention was inappropriate, and went on to find that the program violated neither Daniel's nor his parents' constitutional rights. Plaintiffs now appeal, renewing the same four constitutional challenges. The District does not challenge the court's failure to abstain, so the Burford question is not before us.
 
 DISCUSSION
 
 12
 We review a grant of summary judgment de novo. Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc., 967 F.2d 742, 746 (2d Cir.1992); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).
 
 I. Thirteenth Amendment
 
 13
 Plaintiffs argue that, because the mandatory community service program "requires students to serve others" or forfeit a high school diploma, the program constitutes involuntary servitude. We disagree.
 
 
 14
 The Thirteenth Amendment provides:Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.
 
 
 15
 U.S. Const., amend. XIII, Sec. 1. The dispositive question, then, is whether the mandatory community service program rises to the level of "involuntary servitude" contemplated by the amendment.
 
 
 16
 The Supreme Court has conceded that, "[w]hile the general spirit of the phrase 'involuntary servitude' is easily comprehended, the exact range of conditions it prohibits is harder to define." United States v. Kozminski, 487 U.S. 931, 942, 108 S.Ct. 2751, 2759, 101 L.Ed.2d 788 (1988). The Supreme Court has observed, however, that "the phrase 'involuntary servitude' was intended 'to cover those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results.' " Id. (quoting Butler v. Perry, 240 U.S. 328, 332, 36 S.Ct. 258, 259, 60 L.Ed. 672 (1916)); see also United States v. Shackney, 333 F.2d 475, 485 (2d Cir.1964). We have added that the ban on involuntary servitude "was to abolish all practices whereby subjection having some of the incidents of slavery was legally enforced...." Shackney, 333 F.2d at 485.
 
 
 17
 In application, courts have consistently found the involuntary servitude standard is not so rigorous as to prohibit all forms of labor that one person is compelled to perform for the benefit of another. The Thirteenth Amendment does not bar labor that an individual may, at least in some sense, choose not to perform, even where the consequences of that choice are "exceedingly bad." Id. at 486; see also Watson v. Graves, 909 F.2d 1549, 1552 (5th Cir.1990). For example, a state may require an attorney to work pro bono, United States v. 30.64 Acres of Land, 795 F.2d 796, 800-01 (9th Cir.1986) (attorney may, in the alternative, choose not to practice law), or a doctor who has accepted scholarship funds to perform pro bono services, United States v. Redovan, 656 F.Supp. 121, 128-29 (E.D.Pa.1986), aff'd, 826 F.2d 1057 (3d Cir.1987) (doctor may choose to pay damages for breach of contract). The government may also require the performance of "civic duties" such as military service, Selective Draft Law Cases, 245 U.S. 366, 390, 38 S.Ct. 159, 165, 62 L.Ed. 349 (1918), jury duty, see Hurtado v. United States, 410 U.S. 578, 589 n. 11, 93 S.Ct. 1157, 1164 n. 11, 35 L.Ed.2d 508 (1973), and upkeep of local public roads, Butler, 240 U.S. at 333, 36 S.Ct. at 259-60, without trenching upon the Thirteenth Amendment.
 
 
 18
 In Jobson v. Henne, 355 F.2d 129, 132 (2d Cir.1966), we suggested that the constitutionality of forced labor turns, in large measure, on the nature and amount of the work demanded, and the purpose for which it is required. Thus, while the Thirteenth Amendment does not foreclose the ability of the state to require chores of its institutionalized mental patients, we have recognized that "there may be some mandatory programs so ruthless in the amount of work demanded, and in the conditions under which the work must be performed, and thus so devoid of therapeutic purpose, that a court justifiably could conclude that the [work constituted] ... involuntary servitude." Id.
 
 
 19
 Like so many thorny legal distinctions, it is all a matter of degree. Guided by the Supreme Court in Butler and Kozminski, our own decisions in Shackney[1] and Jobson, and the import of the other cases mentioned above, we join the Third Circuit in finding that the appropriate analysis under the Thirteenth Amendment is a "contextual approach," Steirer v. Bethlehem Area School Dist., 987 F.2d 989, 1000 (3d Cir.1993), examining the challenged labor through a wider constitutional prism.
 
 
 20
 Plaintiffs urge us to ignore context and to focus instead upon the "plain meaning" of the amendment. They argue that, because the organization for which Daniel volunteers will receive a tangible benefit, his work is, almost by definition, "servitude." And they note that, because service is forced upon Daniel under the threat of withholding his high school diploma, the service is "involuntary." Therefore, the plaintiffs assert, the program falls within the plain meaning of "involuntary servitude."
 
 
 21
 Matters are rarely that simple. A search for the plain meaning of the constitutional text does not require--and, indeed, often cannot support--such clinical lexical dissection. Rather, the inquiry must be whether, "taking as a whole the set of conditions existing in the imposition of a mandatory community service program in a public high school, the students providing the services are in a condition of involuntary servitude," Steirer, 987 F.2d at 998, as that singular phrase is understood in its historical context.
 
 
 22
 Taking a contextual approach, we have no trouble concluding that the mandatory community service program does not amount to involuntary servitude in the constitutional sense. The work required is not severe: students must perform only forty hours of service in four years. Furthermore, the nature of the work required and conditions under which it must be performed are hardly onerous. Students may choose among a nearly infinite variety of organizations offering a kaleidoscope of service activities. They are free to arrange their own work schedules, and to work in the summers when other school-related duties are minimal.
 
 
 23
 It is important to note that the purpose of the program is not exploitative. Rather, it is educational, particularly when coupled with the related classroom discussions. Finally, the level of coercion is not so high as to compel a finding of involuntary servitude. Although students who forego their required service will not graduate, they may avoid the program and its penalties by attending private school, transferring to another public high school, or studying at home to achieve a high school equivalency certificate. While these choices may be economically or psychologically painful, choices they are, nonetheless. They might not render the program voluntary, but they contribute to the conclusion that it is not involuntary servitude.
 
 
 24
 Considering all these factors, we find that the program is not constitutionally infirm. That is not to say that any and every service program that a public school district may devise would survive constitutional scrutiny. If, for instance, the students were required to spend their Saturdays at the homes of their teachers, washing their cars, painting their houses, and weeding their gardens, the extent, nature, and conditions of "service," and the more obviously exploitative purpose of the program, might indeed warrant a finding of "involuntary servitude." But this is not our case.
 
 
 25
 Because we conclude that the mandatory community service program is not, on the whole, "compulsory labor" which, "in practical operation" produces "undesirable results" analogous to slavery, Kozminski, 487 U.S. at 942, 108 S.Ct. at 2759-60, we hold that the District's mandatory community service program does not constitute impermissible involuntary servitude.
 
 II. Fourteenth Amendment
 
 26
 Plaintiffs also argue that the program violates both Daniel's and his parents' rights under the Due Process Clause of the Fourteenth Amendment. Again, we disagree.
 
 
 27
 Our analysis begins with the proposition that the Due Process Clause of the Fourteenth Amendment embodies a substantive component that protects against "certain government actions regardless of the fairness of the procedures used to implement them." Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986). This "substantive due process," as it has come to be known, however, does not stand as a bar to all governmental regulations that may in some sense implicate a plaintiff's "liberty." Rather, the level of scrutiny with which we will examine a governmental regulation turns on the nature of the right at issue.
 
 
 28
 When the right infringed is "fundamental," the governmental regulation must be "narrowly tailored to serve a compelling state interest." Reno v. Flores, 507 U.S. 292, 302, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993). Rights are fundamental when they are "implicit in the concept of ordered liberty," Palko v. Connecticut, 302 U.S. 319, 325-26, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), or "deeply rooted in this Nation's history and tradition." Moore v. East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977); see also Bowers v. Hardwick, 478 U.S. 186, 191-92, 106 S.Ct. 2841, 2844, 92 L.Ed.2d 140 (1986); John E. Nowak, Ronald D. Rotunda, Constitutional Law Sec. 11.4, at 374 (4th ed. 1991). Where the claimed right is not fundamental, the governmental regulation need only be reasonably related to a legitimate state objective. Flores, 507 U.S. at 303-06, 113 S.Ct. at 1448-49; Bowers, 478 U.S. at 196, 106 S.Ct. at 2846.
 
 A. Parental Rights
 
 29
 Plaintiffs argue for a "constitutional right of parents to have primary responsibility over the upbringing and education of their children," and they contend that such a right is sufficiently basic and traditional to warrant strict scrutiny. From these two propositions plaintiffs ask us to conclude that parents have a fundamental constitutional right to exempt their children from educational requirements to which they object on secular grounds. We appraise this request with humility and caution, as "judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." Flores, 507 U.S. at 302, 113 S.Ct. at 1447.
 
 
 30
 Parents, of course, have a liberty interest, properly cognizable under the Fourteenth Amendment, in the upbringing of their children. See Runyon v. McCrary, 427 U.S. 160, 176, 96 S.Ct. 2586, 2597, 49 L.Ed.2d 415 (1976); Wisconsin v. Yoder, 406 U.S. 205, 232, 92 S.Ct. 1526, 1541-42, 32 L.Ed.2d 15 (1972). The Supreme Court, however, has never expressly indicated whether this "parental right," when properly invoked against a state regulation, is fundamental, deserving strict scrutiny, or earns only a rational basis review. Our reading of the appropriate caselaw convinces us that rational basis review is appropriate.
 
 
 31
 In Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), the Supreme Court faced a challenge to a state law forbidding schools from teaching foreign languages to students below the eighth grade. The Court held the law unconstitutional as applied, stating that it was "arbitrary and without reasonable relation to any end within the competency of the State." Id. at 403, 43 S.Ct. at 628 (emphasis added). Similarly, in Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), the Court struck down a state law requiring parents to send their children aged 8-16 to public school only (and making it a misdemeanor to send them to private school). The Court, tracking its language from Meyer, found that the statute had "no reasonable relation to some purpose within the competency of the State." Id. at 535, 45 S.Ct. at 573 (emphasis added).
 
 
 32
 More recently, in Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), Amish plaintiffs argued that mandatory school attendance beyond the eighth grade violated their rights under the First Amendment's Religion Clauses. Finding for the plaintiffs, the Court was careful to focus upon the religious nature of their claims, observing in contrast that "[a] way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations." Id. at 215, 92 S.Ct. at 1533 (emphasis added). Thus, while parents have definite rights over their children's education, "they have no constitutional right to provide their children with ... education unfettered by reasonable government regulation." Runyon, 427 U.S. at 178, 96 S.Ct. at 2598 (emphasis added).
 
 
 33
 Reviewing these cases and others, we have observed that "[t]here is a long line of precedents indicating that the government may not unreasonably interfere with ... [the right to] raise one's children as one wishes." Black v. Beame, 550 F.2d 815, 816 (2d Cir.1977) (emphasis added). Other circuits, analyzing state-imposed educational requirements, have expressly applied the rational basis standard when reviewing a parent's claimed right to control the upbringing of their child. See Murphy v. Arkansas, 852 F.2d 1039 (8th Cir.1988); Cornwell v. State Board of Educ., 428 F.2d 471 (4th Cir.1970) (adopting per curiam the full opinion in Cornwell v. State Board of Educ., 314 F.Supp. 340 (D.Md.1969)), cert. denied, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246 (1970).
 
 
 34
 We thus conclude that where, as here, parents seek for secular reasons to exempt their child from an educational requirement and the basis is a claimed right to direct the "upbringing" of their child, rational basis review applies. We are aware that Daniel's parents object because of their "values" or "morals," as opposed to a general objection to the educational wisdom of the program, but we do not find this difference to be of constitutional significance. While the Constitution does indeed distinguish between religious objections and secular objections, see U.S. Const., amend. I; Yoder, 406 U.S. at 215-19, 92 S.Ct. at 1533-35, it makes no similar distinctions among purely secular objections based on values, morals, or other firmly-held beliefs.
 
 
 35
 Furthermore, we do not share plaintiffs' belief that the standard of review should be ratcheted up because the program forces students to "act" in contravention of their parents' values, as opposed to simply exposing the students to information that conflicts on an intellectual plane with those values. First, this "exposure/action" distinction is somewhat chimerical, particularly in the educational context. In the course of education, schools often require more than a passive glance at a book. Indeed, "for the things we have to learn before we can do them, we learn by doing them." Aristotle, Nicomachean Ethics, bk. II, ch. 1. Second, any distinction that can be drawn between exposure and action should properly bear on whether the regulation meets the appropriate standard of review, and not on what that standard of review should be. It may be that, in certain circumstances, exposing students to ideas in the name of education is rational, while requiring them to act on those ideas is not.
 
 
 36
 The District's mandatory community service program easily meets the rational basis test. Education is unquestionably a legitimate state interest. See Brown v. Board of Educ., 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954) ("education is perhaps the most important function of state and local governments"); Ambach v. Norwick, 441 U.S. 68, 80, 99 S.Ct. 1589, 1596, 60 L.Ed.2d 49 (1979). Indeed, the Supreme Court has indicated that the state has a "compelling" interest in educating its youth, to prepare them both "to participate effectively and intelligently in our open political system," and "to be self-reliant and self-sufficient participants in society." Yoder, 406 U.S. at 221, 92 S.Ct. at 1536. The state's interest in education extends to teaching students the values and habits of good citizenship, and introducing them to their social responsibilities as citizens. See Norwick, 441 U.S. at 80, 99 S.Ct. at 1596.
 
 
 37
 Furthermore, the mandatory community service program rationally furthers this state objective. The District reasonably concluded that the mandatory community service program would expose students to the needs of their communities and to the various ways in which a democratic system of volunteerism can respond to those needs. In doing so, the program helps students recognize their place in their communities, and, ideally, inspires them to introspection regarding their larger role in our political system. The program may also help students develop a connection between school and work, and give students an opportunity to evaluate possible careers. The District was also reasonable in concluding that these goals were best achieved by having students actually perform service for a limited amount of time, and discuss that service, as opposed to merely reading about service opportunities. Indeed, the program's focus on learning-by-doing may be crucial in imparting the lessons of the service program.
 
 
 38
 Because the District's mandatory community service program is reasonably related to the state's legitimate function of educating its students, we hold that the program does not violate Daniel's parents' Fourteenth Amendment rights.
 
 B. Student Rights
 
 39
 Plaintiffs also argue that the mandatory community service program violates Daniel's rights under the Fourteenth Amendment. Specifically, they allege that the program violates his rights to: (1) personal liberty; and (2) privacy. Having concluded that the program meets a rational basis review, we need change our analysis only if the substantive due process rights asserted by Daniel are "fundamental," and thus require more exacting scrutiny. We find that they do not.
 
 
 40
 First, Daniel's claim that the program violates his right to "personal liberty" does little more than parrot the language of the Fourteenth Amendment. Although substantive due process rights are guaranteed to an individual, in part, through the liberty component of the Due Process Clause, see, e.g., Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 664-65, 88 L.Ed.2d 662 (1986), this does not mean that a fundamental right is implicated every time a governmental regulation intrudes on an individual's "liberty." Rather, as mentioned above, strict scrutiny is reserved only for those governmental regulations that implicate personal freedoms "implicit in the concept of ordered liberty." Palko, 302 U.S. at 325, 58 S.Ct. at 152.
 
 
 41
 Plaintiffs argue that the choice of when and whether to serve others "has always been left to individual conscience and belief." However, they cite not a single case in which this "individual choice" has been declared a fundamental right, or has warranted strict scrutiny of a governmental regulation. In light of the Supreme Court's recent admonition that we should be "reluctant to expand the concept of substantive due process," Collins v. City of Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992), we decline plaintiffs' invitation to be the first court to so hold. Daniel's choice as to how to spend his free time, and whether or not he will perform any volunteer services, is not the stuff to which strict scrutiny is devoted.
 
 
 42
 Daniel's proffered right of privacy fares no better. Plaintiffs claim that, by obliging students to disclose the organization for which they volunteered, the program unconstitutionally compels the students to disclose "personal information" protected by the Fourteenth Amendment. It does no such thing.
 
 
 43
 Initially, we doubt that the program questionnaire and subsequent classroom discussion implicate any constitutional privacy right or interest. Daniel may choose his service organization from a broad array of organizations, some political or religious, and others clearly neutral. If he does not wish to disclose deeply-held political or religious beliefs, he can simply choose one of the secular, non-partisan organizations. And even if Daniel chooses a political or religious organization, he is not required to state why he chose that group, or whether or not he agrees with its goals and aims, but only what he did and what he learned from the experience.
 
 
 44
 Nor does the program effectively chill Daniel's ability to join organizations of his own choosing in a private setting. Daniel is not required to disclose every organization for which he volunteers, but only that organization he chooses for his credit toward forty hours of community service. Daniel is free, on his own time and of his own volition, to serve any organization he likes, without having to tell anyone about it. True, Daniel may be tempted to choose a neutral organization over another preferred organization for those forty hours. But this is not so profound a burden as to raise significant constitutional concerns.
 
 
 45
 Even if Daniel does state a privacy interest cognizable under the Fourteenth Amendment, we find that the required disclosure as part of the program passes constitutional muster. In Barry v. City of New York, 712 F.2d 1554 (2d Cir.1983), we noted that the correct level of scrutiny for a compelled disclosure of personal information is an "intermediate ... balancing approach." Id. at 1559. Because the program furthers the state's significant interest in education, and requires the disclosure of minimal (if any ) personal information, in the limited setting of the forty-hour service requirement, it is, on balance, easily constitutional.
 
 
 46
 Plaintiffs reliance on Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), (and similar cases) is misplaced. First, Shelton involved freedom of association under the First Amendment, not a general right to privacy under the Due Process Clause of the Fourteenth Amendment. Second, Shelton explicitly limited the scope of its holding in a manner that practically eviscerates Daniel's claim. The Court in Shelton dealt with a state law requiring "every teacher, as a condition of employment in a state-supported school or college, to file annually an affidavit listing without limitation every organization to which he has belonged or regularly contributed within the preceding five years." Id. at 480, 81 S.Ct. at 248. Striking it down, the Court emphasized:
 
 
 47
 The question to be decided here is not whether the [State] ... can ask certain of its teachers about all their organizational relationships. It is not whether the State can ask all of its teachers about certain of their associational ties. It is not whether teachers can be asked how many organizations they belong to, or how much time they spend in organizational activity. The question is whether the State can ask every one of its teachers to disclose every single organization with which he has been associated over a five-year period.
 
 
 48
 Id. at 487-88, 81 S.Ct. at 251-52. The Court concluded that "[t]he unlimited and indiscriminate sweep of the statute" rendered it unconstitutional. Id. at 490, 81 S.Ct. at 253. In no way does Shelton, or any other case cited by plaintiffs, support the notion that Daniel's Fourteenth Amendment right to privacy prohibits the school from requiring Daniel to disclose the single organization for which he performed his limited service in conjunction with a reasonable educational requirement.
 
 
 49
 In sum, the mandatory community service program does not violate Daniel's Fourteenth Amendment rights.
 
 CONCLUSION
 
 50
 We have considered all of plaintiffs' arguments, and find them to be without merit. Accordingly, the judgment of the district court is affirmed.
 
 
 
 [1]
 We do not believe that any of the conclusions reached in Shackney, which relied in part on Hodges v. United States, 203 U.S. 1, 27 S.Ct. 6, 51 L.Ed. 65 (1906), have been altered by the substantial overruling of Hodges in Jones v. Alfred H. Mayer Co., 392 U.S. 409, 443 n. 78, 88 S.Ct. 2186, 2204 n. 78, 20 L.Ed.2d 1189 (1968)