**Anthony L. FORD, Plaintiff,**

v.

**NASSAU COUNTY EXECUTIVE and Nassau County Correctional Center, Defendants.**

**No. Civ.A. 97CV2399(DGT).**

United States District Court, E.D. New York.

March 31, 1999.

Anthony L. Ford, Roosevelt, NY, pro se.

Paul F. Millus, Snitow & Cunningham, New York City, for defendants.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

Pro se plaintiff, Anthony Ford, alleges that while incarcerated as a pretrial detainee at the Nassau County Correctional Center, the defendants, the Nassau County Correctional Center and the Nassau County Executive, violated his "civil and constitutional rights," including his Thirteenth Amendment rights, by requiring him to serve as a "food cart worker" without payment. For these alleged injuries, plaintiff has brought this action pursuant to 42 U.S.C. § 1983 seeking monetary damages totaling $2.5 million dollars. In response, defendants have moved for summary judgment, pursuant to Fed.R.Civ.P. 56(b), to dismiss plaintiff's complaint in its entirety. For the reasons stated below, defendants' motion for summary judgment is granted.

### Background

Having been "charged with outstanding warrants and four Vehicle Traffic Law violations," plaintiff, Anthony Ford ("Ford"), was admitted to the Nassau County Correctional Center ("NCCC") as a pretrial detainee on February 27, 1997. Def. Statement of Material Facts at $1. Ford is no stranger to the correctional facility. In fact, he has been incarcerated at the NCCC on at least nineteen other occasions. Upon his admission to the correctional facility on February 27, 1997, he underwent a health screening where it was determined that, as well as missing fingers from one of his hands, he required medication to control his epileptic seizures. Accordingly, he was housed in a "workers and medical dorm." Ford Dep. at 58. Significantly, two months later, on April 28, 1997, upon a plea of guilty, Ford was sentenced to time already served and discharged from NCCC.

From approximately March 2, 1997 through April 28, 1997, Ford performed the duties of a "food cart worker" for certain inmates who were housed in the new admit tier at NCCC. Ford alleges he was told that if he refused to perform these services, he would be subjected to a fourteen day lock-in, or perhaps "written up." Ford Dep. at 73. As a "food cart worker," Ford shared his responsibilities with two other inmates. See id. at 60. Specifically, Ford pushed a food cart, which was already loaded upon Ford's arrival at the kitchen, to the elevator, located approximately 100 to 125 yards away. The corrections officers assigned to the

wing in which Ford was "working" then distributed the prepared trays of food to the inmates. *See id.* Occasionally, the inmates who were serving as "food cart workers" were required to hand out certain foods, such as milk, bread, or oranges. *See id.* at 63. Furthermore, if there were only one food cart being used during any particular meal, the other two inmates would perform related tasks such as sweeping the guard walk and emptying the garbage. *See id.* at 64.

Ford testified that he was required to work seven days a week, for all three meals a day. However, upon further questioning, he testified that this was not always the case. *Compare* Ford Dep. at 60 *with* Ford Dep. at 68 ("My testimony is not specifically that I [worked] three times a day.") Rather, he worked only when specifically directed to by a corrections officer. *See id.* at 68. According to Ford, these tasks would normally take between 2 and 2.5 hours a meal, including the time it took him to eat his own meal. *See id.* at 68–70. In exchange for these services, Ford was provided with additional food with his own meals. *See id.* at 72. He was not, however, given any monetary consideration for his duties.

As a result of being forced to work, Ford now seeks damages of 2.5 million dollars pursuant to 42 U.S.C. § 1983.

### Discussion

#### (1)

Initially, it must determined whether, based on the facts presented, the two defendants in Ford's complaint are amenable to civil liability under § 1983.

■ Ford's claims against the Nassau County Executive can be summarily dismissed. "[N]either a state nor its officials acting in their official capacities are 'persons' under § 1983, and thus, when sued in their official capacities, no action will lie against them for money damages." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). *See Hafer v. Melo,* 502 U.S. 21, 31, 112 S.Ct. 358, 365, 116 L.Ed.2d 301 (1991) ("[S]tate officials sued in their individual capacities are 'persons' within the meaning of § 1983."). Even if Ford had sued the Nassau County Executive in his personal capacity, however, as a prerequisite for a damages award under § 1983, he would have to demonstrate that the Nassau County Executive was personally involved in the alleged constitutional violation. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Moreover, liability for damages may not be based on the respondeat superior or vicarious liability doctrines. *See Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir. 1989); *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.1973).

■ The Second Circuit recognizes four ways in which a supervisory official may be personally involved in a constitutional violation: (1) he or she may have directly participated in the infraction or be directly involved through ordering such action to be taken; (2) he or she may have failed to remedy a wrong after learning of the violation; (3) he or she may have created or allowed a policy to continue under which the violation occurred; or (4) he or she may have been grossly negligent in managing the subordinates who caused the violation. *See Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986); *Langley v. Coughlin,* 715 F.Supp. 522, 545 (S.D.N.Y.1989). Ford does not offer any evidence showing that the Nassau County Executive was in any way personally involved in the decision to require him to work. Moreover, the record is devoid of any evidence that indicates that the Executive had any knowledge of the labor that Ford was required to perform. Finally, there is no evidence that the Executive directly participated in the decision to require Ford to work, or, even more broadly, that the Executive established any kind of policy permitting the NCCC to require its pretrial detainees to work. All in all, Ford simply has not

396

alleged the requisite "tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). Therefore, defendant Nassau County Executive must be dismissed from the case, despite Ford's efforts to sue him in his individual capacity.

■ Next, Ford's allegations against the NCCC must be addressed. In order to state a claim for relief under § 1983 against NCCC, Ford must show the existence of an officially adopted policy or custom that caused injury and a causal connection between that policy and the deprivation of a constitutional right. *See Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); Neighbour v. Covert, 68 F.3d 1508, 1511 (2d Cir.1995). A policy or custom cannot generally be established by an isolated instance of a deprivation of rights.'

On the one hand, Ford fails to allege or offer evidence that any alleged mandatory labor, other than that which he himself performed, was actually performed by pretrial detainees as distinguished from convicted inmates serving "local time." Ford testified that those inmates sentenced to "local time" at NCCC were automatically required to work. Ford Dep. at 39. This distinction is central to Ford's claim, since he bears the burden of articulating an official policy on the part of NCCC to require its pretrial detainees to work. All in all, Ford does not provide a substantial amount of probative evidence, empirical or otherwise, which directly supports his assertion that NCCC, through an official policy, either requires its pretrial detainees to work, or subjects pretrial detainees to negative action for failing to perform such work.

On the other hand, Ford testified that he was told that if he refused to work, he might be "written up," or placed in "lock-in" for fourteen days. *Id.* at 73. Additionally, Ford testified that during the nineteen times that he was incarcerated at NCCC, he was forced to work on several occasions. *Id.* Ford specifically recalled working two jobs during his various stays at NCCC: "food cart worker" and "baker." *Id.* at 86. All of these claims, especially the warning of possible punishment should Ford refuse to work, suggest that a policy was in place which required that pretrial detainees work during their incarceration.

In short, Ford's deposition testimony presents a close question as to whether he was subjected to a policy within the meaning of *Monell. See Monell,* 436 U.S. at 690, 98 S.Ct. at 2036. However, it is difficult to believe that prison officials would, absent a policy, force Ford to work and threaten him with segregation if he did not. Thus, notwithstanding the potential evidentiary weaknesses in Ford's claim, the merits of Ford's allegations must be addressed.

(2)

To state a claim under § 1983, a plaintiff must cite a specific right, either conferred by the Constitution or federal law, that was violated. *See Baker v. McCollan,* 443 U.S. 137, 139, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979). Ford simply asserts that the defendants violated his "civil and constitutional rights" by requiring him to work. Pl. Letter of June 12, 1998. But, as he is a pro se plaintiff, the court feels obliged to deal with his claim on the merits because it is undisputed that Ford was, in fact, put to work prior to the adjudication of his guilt or innocence. Although plaintiff's papers refer to slavery and double jeopardy, defendants have analyzed this claim, correctly, as invoking the Thirteenth and Fourteenth Amendments. In opposition to the arguments that could be raised under those amendments, defendants contend that requiring Ford's assistance in the distribution of food at NCCC is a legitimate government objective which cannot give rise to a cognizable constitutional claim, under either the Thirteenth or Fourteenth Amendments.

■ Pretrial detainees are protected by the Due Process Clause. *See Bell v. Wolf-*

*ish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). However, not every deprivation results in the basis for a constitutional claim. In this case, it cannot be said that the NCCC violated Ford's rights under that clause.

■ In responding to contentions that the conditions under which pretrial detainees were held deprived those detainees of liberty without due process and thus violated their rights under the Due Process Clause, the Supreme Court has held that "the government [ ] may detain [a defendant prior to trial] and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Bell v. Wolfish,* 441 U.S. 520, 536–37, 99 S.Ct. 1861, 1873, 60 L.Ed.2d 447 (1979). *See also United States v. Millan,* 4 F.3d 1038, 1043 (2d Cir.1993) (addressing how long such detention may last and citing *Bell* ). Furthermore, "absent a showing of express intent to punish," the determination as to whether such conditions amount to punishment will generally turn on whether a purpose is tendered, other than punishment, that is rationally related to those conditions and whether the invasions of the detainee's liberty interests are excessive. *Lareau v. Manson,* 651 F.2d 96, 103 (2d Cir.1981). In this case, there is no evidence of excess or intent to punish; Ford has only alleged that he was "forced" to help distribute food against his will. He does not claim that he was directed to do this in response to any conduct, or misconduct, on his part. Thus, the punishment aspect of his claim could derive from only two sources. One, being required to help to distribute food could itself be understood as punishment. Two, being given the choice between distributing the food and being segregated in "lock-in" or "written-up" could be deemed punishment.

Ford's being required to distribute food cannot, by itself, be considered punishment. The work involved, helping to feed other inmates, is clearly the type that may be classified as serving a legitimate government purpose. Furthermore, as Ford himself testified, he was rewarded for his assistance by being given extra food. Compensation, even minimal compensation, is not in keeping with an intent to punish. Moreover, the kinds of chores Ford did, handing out food, mopping and sweeping, more closely resemble those that have been held to be allowable reasonable "housekeeping duties" than those held to be forced labor.[1]

Although no Second Circuit case has ruled on this issue, it has been addressed in other circuits. In *Bijeol v. Nelson,* 579 F.2d 423, 425 (7th Cir.1978) (per curiam), the Seventh Circuit held that where pretrial detainees were required to participate in "general housekeeping duties," including rotated cleaning assignments of common areas, there was no constitutional violation despite the fact that the detainees were segregated if they did not participate. In that case, inmates received no compensation at all, and the court noted that even more arduous tasks would not affect the court's decision. *See id.* at 424 n. 1. Similarly, in *Hause v. Vaught,* 993 F.2d 1079 (4th Cir.1993), the Fourth Circuit ruled that requiring pretrial detainees to help clean their "module" or else be subjected to 48–hours "lock-down" was not inherently punitive. Furthermore, the content of these holdings has been approved of in dicta by the Second Circuit in a case involving a different factual scenario. In *Buthy v. Comm'r of the Office of Mental Health of New York State,* 818 F.2d 1046 (2d Cir.1987), the Second Circuit held that requiring that inmates of a psychiatric center stay awake sixteen hours at

---

1. *But see Dale v. State,* 44 A.D.2d 384, 387, 355 N.Y.S.2d 485, 489 (3rd Dept.1974) (holding that under Jobson, duties which required that plaintiff "set the tables before meals, refilled salt, pepper and sugar containers af-

ter meals, and swept the floor .... were not of the normal housekeeping type and kind but were in fact institutional maintenance work" and thus violative of Thirteenth Amendment if not carried out voluntarily).

a time was a "de minimis level of imposition with which the Constitution [was] not concerned." *Id.* at 1050 (quoting *Ingraham v. Wright,* 430 U.S. 651, 674, 97 S.Ct. 1401, 1414, 51 L.Ed.2d 711 (1977)). The court explained its ruling in part by citing the *Bijeol* case: "restrictions relating to meals, exercise, and other aspects of institutional life ... are mere 'incidental elements in the organized caretaking of the general company of inmates.'" *Buthy,* 818 F.2d at 1050–51 *quoting Bijeol,* 579 F.2d at 424. The court further noted that "[a] patient committed to the forensic unit, like a pretrial detainee, 'has no constitutional right to order from a menu or have maid service.'" *Id.* at 1051 (quoting *Bijeol,* 579 F.2d at 424). Thus, it may be confidently said that the *Bijeol* case reflects the Second Circuit's views.

That Ford alleges he had to choose between helping deliver food and being put on "lock-in" is only slightly more troubling. As noted in *Tellier v. Reish,* No. 94 Civ. 8029, 1996 WL 735584, at *9 (S.D.N.Y. Dec.23, 1996), *vacated in part,* 164 F.3d 619 (2d Cir.1998), the Second Circuit has not ruled on whether or not this choice violates a pretrial detainee's liberty interest.[2] However, as noted above, neither the *Bijeol* court nor the *Hause* court found

that presenting a choice between lock-in and a reasonable amount of work created a constitutional deprivation. As the only relevant law available seems to hold that forcing a pretrial detainee to choose between segregation and "housekeeping" is not a violation of due process, and, in that the Second Circuit has cited the *Bijeol* case with approval, Ford has no remedy available here on his due process claim. This is the only sensible conclusion.[3]

It is important to add that certain types of required labor might indicate an intent to punish and, therefore, would constitute a interference with the liberty interest under *Bell v. Wolfish.* While help with the "chores" around the detention center is a reasonable requirement of those who live there, tasks which carry with them demeaning connotations might amount to punishment—for instance, requiring a detainee to clean a toilet with a toothbrush. Alternatively, even non-demeaning tasks may be unduly strenuous for a particular detainee and, therefore, exceed what is acceptable. Although this type of case-by-case review may appear to force courts to engage in unwarranted supervision of prison institutions, in fact, it should be fairly obvious to any professional warden what are acceptable "chores" and what are not.

---

**2.** In addressing Ford's due process claims, defendants distinguish between Ford's liberty and property interests. Ford's liberty interests claim is discussed above. As to his property interests, defendants argue that, under the holding in *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), Ford's property rights were not violated because Ford had no "legitimate expectation of entitlement for the sort of work that he performed as a pretrial detainee." Def. Mem. of Law at 7. In the *Roth* case, the Supreme Court ruled that an associate professor who was denied tenure had no claim for deprivation of property without due process where there was no law or university policy in place which create an entitlement to tenure. The more important point, however, which was implicitly recognized by the *Bijeol* and *Hause* cases, *see infra,* is that certain impositions on detainees are reasonable and necessary in light of the realities of running any institution, including one for incarcera-

tion, and Ford could not have any expectation that these work demands would not be required of him.

**3.** As noted by the *Tellier* court, the First Circuit has implied, and the Eighth Circuit has held, that the "pitch-in or sit-in" choice violates a pretrial detainee's liberty interest: the First Circuit in *Chestnut v. Magnusson,* 942 F.2d 820, 823 (1st Cir.1991), and the Eighth Circuit in *Martinez v. Turner,* 977 F.2d 421, 423 (8th Cir.1992). While it may be noted that both opinions appear to be based upon misreadings of precedent, it is unnecessary to lengthen this opinion with an explanation for this conclusion because, in any case, *Chestnut* has never been cited by the Second Circuit, and *Martinez* has only been cited once in support of the unrelated holding that hunger-striking prisoners may be force-fed without violating their constitutional rights. *See Grand Jury Subpoena John Doe v. United States,* 150 F.3d 170, 172 (2d Cir.1998).

Here, there is no evidence that Ford's chores, despite his medical status, were overly burdensome to him. Under any standard, the tasks assigned to plaintiff were reasonable, appropriate, and not punishment.

### (3)

Apart from the holding that Ford has suffered no cognizable invasion of his due process rights through his forced housekeeping because of the nature of his chores, Ford is also precluded from any recovery under § 1983 because of his lack of damages.

■ The Supreme Court has been very clear that § 1983 provides compensatory damages only for actual harms that result from the deprivation of constitutional rights. In a far more compelling case involving a tenured public school teacher who was suspended from his position with pay but without a hearing because of false accusations that he was exhibiting sexually explicit material in a life science class, the Supreme Court ruled that jury instructions which charged: (1) that the jury could award compensatory damages based simply on a deprivation of a constitutional right (apart from the plaintiff's losses, expenses, mental anguish or emotional distress), and (2) that the jury could evaluate those damages by considering the importance of the right violated were in error. *See Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 307, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986) (" 'The basic purpose' of § 1983 damages is 'to compensate persons for injuries that are caused by the deprivation of constitutional rights.' ") (quoting *Carey v. Piphus*, 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978)). The jury in *Stachura* had awarded $275,000 in undistinguished compensatory damages and $46,000 in pu-

nitive damages. *Id.* at 303, 106 S.Ct. at 2541. The Supreme Court, while sustaining the punitive damage award, noted that the large compensatory award was probably substantially based on the value of the constitutional right and ordered a new trial on the issue of compensatory damages. *Id.* at 312, 106 S.Ct. at 2545. This opinion served to reinforce *Carey's* holding that § 1983 best serves its purpose when it provides damages for tangible harms as opposed to abstract invasions.[4] *See Stachura*, 477 U.S. at 308, 106 S.Ct. at 2543.

Indeed, in *Carey v. Piphus*, the Supreme Court had earlier held that if the harm providing the basis for compensatory damages would have resulted even with the proper due process, the harmed "will not be entitled to recover damages to compensate them." *Carey*, 435 U.S. at 260, 98 S.Ct. at 1050. There, it was held that high school students suspended without the proper hearings because they were caught smoking marijuana would not be entitled to damages if it could be shown that they would have been suspended even had the proper procedures been followed.

Courts in the Second Circuit have mirrored this reasoning through their utilization of a "no-harm, no-foul" approach to due process violations involving administrative proceedings in prisons. *See, e.g., Cespedes v. Coughlin*, 956 F.Supp. 454, 473–474 (S.D.N.Y.1997) (holding that procedurally defective disciplinary process which resulted in the deprivation of "goodtime credits" created no basis for § 1983 remedy where credits were restored through administrative appeal before their loss had an effect on length of incarceration); *Silva v. Sanford*, No. 91 Civ. 1776, 1998 WL 205326, at * 13 (S.D.N.Y. April 24, 1998) (holding that where administrative reversal of procedurally defective Tier III prison disciplinary proceedings result-

---

**4.** *Stachura* noted that nominal damages may be awarded simply for violations of due process, as they were in *Carey*. *See Stachura*, 477 U.S. at 308 n. 11, 106 S.Ct. at 2543. It explained that such nominal damages indicate that "the law recognizes the importance to organized society that those rights be scrupulously observed," but that basis alone cannot give rise to any substantial recovery. *Id.* (quoting *Carey*, 435 U.S. at 266, 98 S.Ct. at 1053).

ed in a sentence of a longer period of time than the time served in Special Housing Unit, under the defective proceeding there was no basis for a remedy under § 1983 because there had been no harm from the time actually served in segregation). Under this approach, an injury suffered as a result of a due process violation can be cured where subsequent events nullify the injury. For example, where an inmate is injured by serving time in a Special Housing Unit ("SHU") as a result of a constitutionally infirm disciplinary hearing, but ultimately is retried and receives an equal or greater punishment than the punishment previously imposed, courts have held that he does not have a claim for deprivation of his constitutional rights because he has suffered no greater punishment. *See Valentine v. Honsinger*, 894 F.Supp. 154, 157 (S.D.N.Y.1995) (no recovery under § 1983 where, despite faulty disciplinary proceeding, "[p]laintiff suffered no additional punishment as a result of the rehearing").

■ Ford's situation falls neatly into this "no-harm, no-foul" line of precedent. As in *Carey*, Ford's guilty plea and sentence indicate that he has been subjected to no more punishment than he would have been had he received an immediate trial and been sentenced to sixty days at the NCCC the same day he was arrested. As the chores he completed could have been required of a convicted inmate, neither his liberty interest nor his property interest was ever infringed upon to a greater extent than allowed by his sentence. He, thus, suffered no damages from these chores and, other than possible nominal damages, is entitled to no award under § 1983.[5]

Having pled guilty and received a jail sentence of time served, or sixty days, which by definition encompassed the very period of time during which he claims he was unlawfully required to work, Ford has vitiated any claim under § 1983. Any labor which would have been appropriately required of a convicted inmate cannot now be found to have harmed him because he has not received greater punishment or deprivation of liberty than any other inmate sentenced to the same amount of time to which he was sentenced. Indeed, his testimony indicates that he was subjected to a lesser deprivation than other inmates because he received privileges as a result of his service that convicted inmates would not have received. In short, Ford has suffered no additional harm as a result of his term of service as a "food cart worker." It should be noted that, had Ford not been sentenced to time served, this case would not be amenable to this "no-harm" analysis. In other words, prison officials who utilize pretrial detainees for additional help, if they step beyond the bounds of acceptable "chores,"—i.e., require a pretrial detainee to work at a non-housekeeping job—do so at their own peril. However, here, Ford's guilty plea and the subsequent conversion of his detained period in the NCCC to time served under sentence of law cured any constitutional deprivation that occurred during that time in which his status was that of a pretrial detainee. As a result, Ford has no substantive remedy.

### (4)

■ Separately, plaintiff asserts that the NCCC subjected him to conditions that were tantamount to slavery and thus, violated his Thirteenth Amendment rights. However, in order to state a claim

**5.** In light of the conclusion that Ford's being required to work the food cart was not a violation of his "civil and constitutional rights," there is no need to consider the possible award of nominal damages under this "no harm, no foul" analysis. Similarly, even if Ford had named individual guards or the warden in his claim, punitive damages would not create an issue in this case. While, under

§ 1983, "[p]unitive damages may be awarded even in the absence of a compensatory award," *Robinson v. Cattaraugus County*, 147 F.3d 153, 161 (2d Cir.1998), they are available only upon a showing that there was some malice or reckless disregard towards the plaintiff and his rights. Ford has not alleged or presented any evidence that would justify such an award.

under the Thirteenth Amendment, a plaintiff must demonstrate he has been subjected to "compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results." *Butler v. Perry,* 240 U.S. 328, 332, 36 S.Ct. 258, 259, 60 L.Ed. 672 (1916). In evaluating claims under the Thirteenth Amendment, a court must take a "contextual approach," considering such factors as the nature and amount of work demanded, and the purpose for which it is required. *See, Immediato v. Rye Neck School District,* 73 F.3d 454, 459–460 (2d Cir.1996).

In the Second Circuit, this approach has resulted in an analysis similar to the one engaged in above for due process violations. In *Jobson v. Henne,* 355 F.2d 129 (2d Cir.1966), the Second Circuit assumed that states could require, without violating the Thirteenth Amendment, "that a lawfully committed inmate perform without compensation certain chores designed to reduce the financial burden placed on a state by its program of treatment for the mentally retarded ... chores of a normal housekeeping type and kind." *Id.* at 131. In that case, the court ruled that allegation of sixteen hour work days on the part of an inmate might constitute a violation. In *Immediato v. Rye Neck School District,* 73 F.3d 454 (2d Cir.1996), the court noted that "[t]he Thirteenth Amendment does not bar labor that an individual may, at least in some sense, choose not to perform, even where the consequences of that choice are 'exceedingly bad.'" *Id.* at 459 (citation omitted). There, the court held the requirement that a high school student participate in community service activities in order to graduate was not violative of the Thirteenth Amendment. Similarly, the Fifth Circuit has held that requiring an immigration detainee to either work eight hours a day in food services or be segregated is not a violation of Thirteenth Amendment. *See Channer v. Hall,* 112 F.3d 214, 218 (5th Cir.1997). In the present case, Ford does not allege that a burdensome work schedule was imposed upon him. Instead, he asserts that while a detainee he could be called upon at any time to help distribute food. This does not smack of the kind of evil prohibited by the Thirteenth Amendment.

To allow Ford's sincere, yet implausible, claim under the Thirteenth Amendment to prevail would dramatically demean the deep significance of that Amendment. The Thirteenth Amendment was drafted and incorporated into the Constitution to rid our nation of the many evils associated with the institution of slavery. Sadly, Ford alluded to these evils in his moving papers, as he described the pain and suffering which was unjustly inflicted on members of his own family who were slaves. By contrast, however, Ford's own alleged assistance in the distribution of food, for which he received at least some consideration, does not rise to the level of indignity and degradation that accompanied slavery. To hold otherwise would trivialize the pain and anguish that the Thirteenth Amendment sought to remedy. Accordingly, Ford's claims under the Thirteenth Amendment must be dismissed.

## Conclusion

For the reasons stated above, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to enter judgment in conformity with this opinion and close the case.

SO ORDERED.