[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MERITS OF CLAIMS AND ON REQUEST FOR INJUNCTIVE RELIEF
The issue in the above-captioned action is the constitutionality of a school dress code imposed by the Waterbury board of education on students attending the Waterbury Public Schools. The plaintiffs are Teshana Byars, a minor who brings her claims through her parents, Dennis Byars and Arline Stephenson; Levaughn Johnson, a minor who brings his claims through his next friend and guardian, Theresa Williams; Bryan Layton, a minor who brings his claim through his next friend and guardian, Cynthia Slaney; and Aimee Scarduzio, a minor who brings her claim through her next friends and guardians Joseph Scarduzio and Sherry Scarduzio. The defendants are the City of Waterbury, its board of education, former superintendent of schools Roger Damerow, former interim superintendent of schools Matthew Borrelli, and present superintendent of schools David L. Snead.
The minor plaintiffs allege in the amended complaint dated December 4, 2000, that they have been suspended and expelled from school for violating the dress code, and they allege that the enforcement of the dress code violates their rights to liberty and privacy under theFourth, Ninth and Fourteenth Amendments to the United States Constitution. (Count One.) They also allege that such enforcement deprives them of the right to a free public education in violation of Article Eighth, § 1 of the Connecticut constitution (Counts Three and Four) and to their rights to privacy and liberty in violation of ArticleFirst, §§ 7, 8, 9 and 10 of the Connecticut constitution. (Count 5.)
The parents of the minor plaintiffs allege that the enforcement of the dress code violates their right to exercise parental autonomy in violation of the First and Fourteenth Amendments to the United States Constitution (Count Two) and their right to personal liberties and CT Page 15637 privacy in violation of Article First, §§ 7, 8, 9 and 10 of the Connecticut constitution. (Count Five.)
While it may be expected that a constitutional challenge to a public school dress code would be grounded in students' desire to express a personal or political message or to engage in social commentary, the plaintiffs in this case have steadfastly denied that they have any such expressive aim or interest.
The plaintiffs have made no claim that the enforcement of the dress code in the public schools has deprived them of rights of freedom of expression protected by the First Amendment to the United States Constitution. This court noted in its ruling on the defendants' motion for summary judgment that the plaintiffs had not asserted any claim based on the right of freedom of expression. The plaintiffs did not seek to amend their complaint after that observation by the court, a course that the court finds confirms its construction of the amended complaint as not raising such a claim. In their post-trial briefs the plaintiffs confirm that they do not invoke any provision of the First Amendment.
The plaintiffs bring their claims based on the United States Constitution pursuant to 42 U.S.C. § 1983, which makes persons acting under color of state law liable for violations of rights secured by federal law. They bring their state constitutional claims as direct claims arising under the cited provisions of the Connecticut constitution.
The defendants have pleaded as special defenses that Conn. Gen. Stat. §§ 10-221f and 10-220a authorize local boards of education to adopt dress codes and school uniform policies. They have also pleaded as special defenses that the school attire policy at issue is rationally related to educational interests and that the plaintiffs have failed to mitigate their damages.
Procedural History
At the time the plaintiffs filed their original complaint in April 1999, the school dress code policy included a provision that allowed students whose parents filed a form by a stated deadline to opt-out of some of the provisions of the policy, notably, those precluding the wearing of blue jeans. The plaintiffs sought preliminary injunctive relief against the enforcement of the non-mandatory policy. Their application was denied after a hearing by the court, Caruso, J, in a ruling filed June 4, 1999. In May 2000, the plaintiffs amended their complaint to allege that the defendant board of education had amended its school attire policy to eliminate the opt-out provision, thereby making CT Page 15638 it mandatory for all the plaintiffs to comply with all of the limitations on apparel stated in the policy or face punishments including suspension and expulsion from school.
The defendants filed a motion for summary judgment as to all of the plaintiffs' claims. In a memorandum of decision filed on July 21, 2000, this court granted that motion only to the extent that it sought ajudgment that enforcement of a policy against students' wearing baggy pants that impede their safety by causing slipping and tripping hazards does not constitute a violation of any of the rights asserted by the plaintiffs. The court otherwise denied the motion, finding that the submissions failed to demonstrate undisputed facts that entitled the movants to judgment as a matter of law.
Though the defendants claimed the case for a trial by jury, the parties stipulated that the merits of the claims and the plaintiffs' requests for injunctive relief would be tried to the court without a jury, and that in the event of a finding of liability, the damages issues would be tried to a jury.
Mootness
As of the commencement of the 2001-2002 school year, all four of the minor plaintiffs are in the ninth grade or a higher grade. None of them is therefore subject at this time to any part of the school attire policy that relates to elementary school students or to middle school students, since none of them is assigned to an elementary or middle school. The portions of the school attire policy that affect the minor plaintiffs as students in the public school system are those applicable to high school students. The plaintiffs agreed in closing argument that they do not seek injunctive relief as to the provisions of the school attire policy that regulate the clothing choices of students in elementary or middle school, and that they seek injunctive relief only with regard to the policies that apply to high school students. They seek money damages for alleged violation of their rights while they were subject to the school attire provisions applicable to middle school students, that is, in school years 1999-2000 and 2000-2001, as well as expungement of their dress code suspensions from their school records for their middle school years.
The court finds that the dispute is moot as to the future application of the dress code policy applicable to elementary and middle school students, as the plaintiffs are no longer in middle school and are no longer subject to the requirements applicable to that age group.
A dispute is moot if during the pendency of the case events occur that CT Page 15639 preclude the court from granting any practical relief to the plaintiff.Napoletano v. CIGNA Healthcare of Connecticut, Inc., 238 Conn. 216, 230, cert. denied, 520 U.S. 1103, 117 S.Ct. 1106, 137 L.Ed.2d 388 (1997).Loisel v. Rowe, 233 Conn. 370, 378 (1995); In re Romance M, 229 Conn. 345,357 (1994). "The requisite personal interest that must exist at the commencement of the litigation (standing) must continue through its existence (mootness)." Loisel v. Rowe, supra, 233 Conn. 378-79, quoting H. Monaghan, "Constitutional Adjudication: The Who and When," 82 Yale L.J. 1363, 1384 (1973). To the extent that the plaintiffs seek to enjoin the application of the school attire policy in elementary and middle schools in Waterbury, they now lack standing, as they are no longer subject to the requirements of these portions of the policy, having progressed to the high school grades.
The plaintiffs have made no claim that the issue of injunctive relief in aid of alleged constitutional violations resulting from enforcement of the portions of the dress code that apply to elementary and middle school students is capable of repetition yet will evade review. See Loisel v.Rowe, 233 Conn. 370 (1995). Students remain in elementary school for at least four years and in middle school for three years, and it has not been demonstrated that a plaintiff who was subject to that policy could not obtain an adjudication of a challenge to the school attire policy within such a time period, nor has it been demonstrated that the same issue is likely to be raised in the future by other middle school students. Board of Education v. State Board of Education, 243 Conn. 772,778 (1998).
Scope of the claims
The plaintiffs make no claim that the dress code imposes extra expense on the plaintiffs, and they base none of their claims on the cost involved in obtaining clothing that complies with the dress code. They make no claim based on freedom of expression in general or political expression in particular. They make no claim based on religious practice or physical disabilities. The policy at issue includes specific provision for accommodations in these latter respects.
Minor plaintiff Teshana Byars' claim is that she is deprived of the liberty to wear blue jeans while attending school and that she is deprived of assignment to the regular educational program if she fails to adhere to the school dress code that prohibits wearing blue jeans. The other minor plaintiffs have not presented evidence to establish what their actual claims are. The parents claim that the defendants' enactment and enforcement of the dress code infringe their right to exercise autonomy as parents. CT Page 15640
Findings of fact
In the spring of 1997, the Waterbury board of education approved a pilot program to try out in twelve elementary schools and one middle school, North End Middle School, a school attire policy that limited students to wearing clothing of prescribed styles and colors. The board enacted a school attire policy for the 1998-99 school year that contained three sets of provisions: 1) restrictions on the styles and colors of clothing allowed in elementary and middle school, 2) a less extensive range of restrictions for the high school, and 3) a list of items and styles prohibited throughout the school system, including gang colors, revealing styles, torn or tattered styles, hazardous footwear and jewelry and electronic devices such as beepers and laser pointers.
In 1998-1999, the school attire policy provided that parents could file forms at the beginning of the school year exempting their children from the requirements concerning styles and colors, but not from the list of prohibited items. For the 1999-2000 school year and to the present, the board of education made the requirements of the school attire policy mandatory, with no option for a parent to exempt his or her child from any of its requirements. The policy provides that students who fail to comply are subject to a one-day suspension from school for the third and subsequent offenses. It further provides that a student who has been suspended more than ten times in a school year for violating the policy may be recommended for expulsion from school.
The parties have stipulated (Ex. 100) that plaintiff Teshana Byars was expelled from school on July 20, 1999, after a hearing. They have further stipulated that the reason given for the expulsion was that she had violated the school attire policy 49 times between March 9, 1999, and the end of the 1998-99 school year and that she was "deliberately disrespectful to school officials on March 17, 1999 and June 10, 1999," that she deliberately violated school policy by attending school on days when she was suspended, on March 12, 17, 23, and April 15, 1999, and that she "deliberately disobeyed the instructions and directions of school personnel on March 17, 19, 22, 23, 24, 26 and April 5 and 9, 1999. The letter announcing the expulsion stated that the expulsion "would be held in abeyance if Ms. Byars agreed to comply with the discipline policy and school attire policy and to obey the instructions of school personnel."
Ms. Byars was assigned to an alternative school operated by the Waterbury board of education known as the Enlightenment School at the Academy for the period of her expulsion. The Enlightenment School provides an alternative educational program to students in the Waterbury school district who are over-age or who have had chronic discipline problems. The dress code is not in effect at the Enlightenment School, and CT Page 15641 Ms. Byars was free to wear blue jeans at that school. She and her parents objected to her assignment to this school and her parents instead chose to home school Ms. Byars during the 1999-2000 school year, the year of her expulsion, and to the present.
Ms. Byars did not testify. Her mother, Arline Stephenson, testified that before the effective date of the mandatory dress code, Ms. Byars had been in the habit of wearing blue jeans to school, but that the blue jeans she wore were not of the oversize variety that presented an impediment to walking and climbing stairs. No direct testimony was presented concerning what article of clothing Ms. Byars was wearing that led to any of her 49 suspensions for violating the school attire policy; however, this court infers that the violations were the continued wearing of blue jeans, which are not permitted under the dress code policy for any grade level.
The school attire policy at issue, at Section 5.3, prohibits all students at all grade levels from wearing a variety of items, including blue jeans. The prohibition against blue jeans is not restricted to those of the oversize variety. The list of prohibitions also includes clothing indicating gang affiliations, beepers, cellphones, laser pens, footwear that is "a noisy distraction or which is unsafe or a health hazard," hooded shirts, and clothing which bares the midriff.
The school policy applicable to middle schools requires students to wear only conventionally styled clothing in a narrow range of colors. The policy requires that girls wear skirts, pants, shorts, skorts, dresses or jumpers of "dress" or "docker" style, worn and belted at the waist, restricted to solid navy blue, black gray or khaki, and blouses or shirts with sleeves and a collar either "oxford, polo or turtleneck" that cover the waistline when arms are raised. The only permitted colors are light blue or white and a third additional solid color chosen by the individual school. The policy requires boys attending middle school to wear pants or shorts of "dress or docker style" worn and belted at the waist, in the same colors as prescribed for girls and shirts of the same description and limited color choices as those prescribed for girls. All of the plaintiffs were subject to the requirements of this policy from September 1999 to June 2001, and their choice of apparel was subject to the limits of this policy during the days they attended school, other than after expulsion.
The policy limits footwear to conventional styles and allows only plain white or black sneakers.
The policy applicable to high school students retains the limitation to "dress or docker style" pants for both genders and requires sleeves and CT Page 15642 collars. The policy requires boys to tuck in their shirts and girls to wear shirts that do not rise above the waistline when arms are raised. Jeans that are black or wheat-colored are permitted; blue jeans are not. The range of colors for other apparel is not limited for high school students as it is for elementary and middle school students; however, the list of prohibited items and styles applies.
This court has not set forth all details of the restrictions, which appear in Appendix A.
At trial, the defendants presented several school board members, several school administrators, and several teachers to explain the reason for enactment of the policy at issue. To some extent, these witnesses simply expressed their own preferences for conventional styles of dress and their own preference for certain kinds of clothing that they believe make students look "good," "professional," or "appropriate." The court attaches no weight to these expressions of personal taste. The board also presented, however, some witnesses who described frequent disruptive, distracting conduct directly tied to the types of clothing that students were wearing to school in the years immediately preceding the imposition of the school attire policy at issue.
These witnesses reported that in the years immediately preceding the imposition of the dress code, students' choice of clothing and the extent of their interest in clothing styles and fashions, including fashions originating in prisons, was causing distractions in the classroom, on busses on the way to school, and during lunch and recess periods. Teachers and administrators testified without contradiction that before the policy was enacted, middle school students frequently engaged in disputes and taunting concerning each other's ownership or lack of ownership of designer blue jeans, apparel with prominent Tommy Hilfiger or other favored logos, and expensive sneakers. Teachers with many years of experience testified that much instructional time was lost to adjudicating disputes concerning such items, reporting or investigating thefts of coveted items, and trying to stop those who possessed fashionable items from scoffing at those who did not and who were either dismayed or moved to truculence by invidious comparisons. In schools in which students change their clothes for physical education, designer jeans and expensive sneakers and other prestige items were frequently stolen. Teachers on occasion had to delay as many as sixty students from moving to their next class while they investigated thefts in areas with insufficient lockers or locks for them. Students' interest in and opinions about such events carried over into the classroom and were not easily set aside when lessons began.
Disputes over clothing or taunts about clothing that began on bus trips CT Page 15643 carried over into the instructional periods, distracting both the participants and others in the class from the educational tasks at hand. Janice Stephens, a sixth grade language arts and reading teacher testified convincingly that upon occasion when she called the homes of students she knew to come from poor families to find out why they were not in school, she was told that they refused to attend because they had been subjected to teasing about their clothing and their inability to afford the kind of items admired by their classmates.
Barbara Giancarlo, a physical education teacher and administrator in the Waterbury public schools for twenty-three years, testified that in a school in which ninety percent of the students qualified for free or reduced price meals under federal poverty subsidies, students of meager means were jeered, pushed and bullied for having only "skiffs" (cheap sneakers).
Brian Farrell, a school psychologist, described incidents in which designerjeans were stolen during gym period and stuffed into toilets or damaged by students resentful of their owners. He testified that before the imposition of the dress code, he had frequently counseled children whose problems included despair at having been made the butt of taunts or teasing by multiple classmates concerning their apparel. Deborah Schatzle-Baker, a member of the Waterbury board of education whose work in a nonprofit school-career transfer program makes her a frequent visitor to some of Waterbury's public schools, testified that the board of education tried at first to regulate only the precise item of clothing that was causing the most disruptions, for example, outlawing bandanas that signified gang memberships or other allegiances. She stated convincingly that these item-by-item regulations failed to reduce distractions, in that the students would find new, coded ways to demonstrate affiliations. She observed many incidents in which instructional time was lost to fights that began with comments about stylish versus "corny" clothing.
The evidence, taken as a whole, suggests that piecemeal banning of particular items did not have a sufficient effect on reducing taunting, distractions and disruptions, and that the board of education therefore turned to a plan to eliminate the agenda of attention to fashionable acquisitions by limiting students' garb to choices that did not lend themselves to controversy.
Disputes that began with observations about clothing were not a matter of an occasional occurrence, and students' comments about clothing, though characterized by some witnesses as "teasing," were delivered in a manner that was hurtful and sometimes vicious. Classroom teachers frequently had to suspend teaching to break up disputes or conversations CT Page 15644 about clothing, the cost of clothing, whether a student could or could not actually afford the clothing at issue, and whether students were inferior because of their clothing.
Students used certain articles of clothing or style to express membership in cliques or groups, causing those excluded to be apprehensive about the presence and menacing nature of such groups, who threatened or beat up students who inadvertently or purposefully wore the identifying items if they had not been accepted into the group. One teacher reported that a student reported reluctance to attend school because he was fearful of unwittingly wearing some color or item that such a group had adopted as its signal.
School enrollment in Waterbury's three middle schools has risen sharply between the 1997-1998 school year and the present. Each of these schools has at least one hundred more students now than then; however, levels of staffing have either stayed the same or decreased, leaving the schools less equipped to address fights, disputes, bad conduct, and thefts arising from a preoccupation with clothing.
The court finds that at the time the board of education enacted the school attire policy at issue, the fashionableness and cost of clothing worn to school had become a preoccupation and an issue that caused disruption of instructional time, fights, thefts, and distractions from educational activities that were not cured by banning individual items. The need to address the problems led the board of education to the approach of reducing the stimuli by requiring attire that was serviceable but unremarkable, relieving students from the perceived need to compete with each other in the "coolness" of their clothing.
Though enforcement of the school attire policy was not shown to have resulted in measurable improvements in performance on standardized tests or on attendance in the middle schools, teachers reported that they spend less time on fights and taunting based on clothing and that thefts of clothing that comports with the dress code are rare, eliminating the distractions and disruptions caused by the need to investigate and adjudicate bad conduct related to or arising from clothing. The school psychologist, Mr. Farrell, reported that feelings of inferiority based on clothing are not being reported to him by the students he counsels since the school dress code went into effect. Though no witness claimed that the school attire policy removed all problems from the middle schools (one board of education member rather jokingly described the change as "from chaos to organized chaos,") it has cut down on the amount of school time lost to preoccupations with clothing and reduced the instances of contraband of various kinds being discovered on students' persons. CT Page 15645
Questioned whether the students simply transfer their comparisons of clothing to the items that comply with the dress code, witnesses testified to the effect that the youth culture does not attach status importance to the kinds of items allowed by the dress code, and that possession of an expensive version of the approved items has not stirred the same bragging and taunting that possession of designer blue jeans or logo wear prompted. The high school dress code permits jeans that are black or wheat-colored because students attach no cachet to such items as they do to designer blue jeans, and jeans in these less fashionable colors have not led to thefts, disputes or disruptions.
Liability Under § 1983
The plaintiffs base their federal claims on 42 U.S.C. § 1983, which provides in pertinent part:
 Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress.
This statute provides the basis for the plaintiffs' causes of action based on alleged violations of rights secured by the Constitution of the United States. It does not create a right of action for the claimed violation of provisions of the state constitution. A municipality or other body politic is a "person" liable under § 1983 for violations of federal rights through the enforcement of a policy or regulation.Monell v. Department of Social Services of the City of New York,436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).
The individual defendants are liable pursuant to § 1983 if they acted under color of state law in a manner that violated the plaintiffs' rights under federal law.
Claims of Minor Plaintiffs Johnson, Layton and Scarduzio
In order to establish that any of the defendants is liable, each plaintiff had to present evidence to prove that each defendant subjected him or her to a policy or conduct that violated a right protected by federal law. Some of the plaintiffs failed to present any evidence to CT Page 15646 support their claims, as they did not offer either testimony or documentary evidence to establish what the conduct was that caused them to be suspended and/or expelled from school. Their claim is that the conduct that exposed them to a deprivation of the right to attend school was constitutionally protected conduct. Without an evidentiary record to establish what the actual conduct was, this court has no adequate basis to adjudicate their claims.
Minor plaintiffs Johnson, Layton and Scarduzio did not testify, nor did their parents or guardians. The parties stipulated that Levaughn Johnson was suspended thirty-four times and expelled for the 1999-2000 school year, and that he was furnished with an alternative placement at the Enlightenment School for 1999-2000. The parties stipulated that the other two minor plaintiffs were each suspended from middle school for violations of the school attire policy, but no evidence was presented that they were expelled. No evidence was presented concerning the nature of the offenses that led to the suspensions of plaintiffs Johnson, Layton or Scarduzio. The evidence does not give this court any way of determining whether the violations were for wearing a color or style that was not on the list of approved styles and colors for each student's school or whether it was for carrying laser pens or other electronic equipment or for wearing oversize trousers that presented a tripping hazard.
In the course of oral argument at the conclusion of the trial, the court inquired whether any of the documents submitted included any description of the infractions for which the plaintiffs were disciplined. Plaintiffs' counsel stated that this information was set forth in the exhibits concerning disciplinary proceedings. It is not. During the course of the trial, the plaintiffs did not move to open the evidence to present additional information, nor did they request that the court take judicial notice of any finding from any other proceeding.
In their post-trial brief, however, the plaintiffs assert that this court should make findings on the basis of statements made in Judge Caruso's ruling denying preliminary injunctive relief. The court issued a notice setting a date for the defendant to assent or object to the plaintiff's post-trial assumption that the court may take judicial notice of facts not presented at the trial on the merits. The defendants filed an objection on October 22, 2001.
The provisions of the Connecticut Code of Evidence, at § 2-2, prohibit this court from relying on evidence that was not made the subject of a request for judicial notice during the presentation of evidence at trial. Section 2-2 requires a party requesting the court to take judicial notice of a fact to "give timely notice of the request to all other CT Page 15647 parties." The same provision states that the court must provide the non-requesting party an opportunity to be heard concerning the request for taking of judicial notice. Section 2-2 makes no provision for taking judicial notice after the trial has been concluded, and the defendants have objected to opening the evidence to schedule a further hearing to receive additional evidence that the plaintiffs neglected to present during the trial. This court must therefore decide this case based only on the evidence duly presented during the trial on the merits in open court before the parties rested.
The evidence presented at trial does not reveal what the violations of the dress code were that led to the suspension of any of the minor plaintiffs except Ms. Byars.
This court ruled in deciding the defendants' motion for summary judgment that a regulation that prohibited students from wearing trousers so large that their volume impeded walking and so long that their hems got under the feet of the wearers, causing hazards of slipping, especially on stairs is a valid exercise of the defendants' powers to regulate student conduct for purposes of health and safety and that the enforcement of such a regulation does not violate any of the civil rights asserted by the plaintiffs. Because of the dearth of proof concerning any of the plaintiffs other than Teshana Byars, the court cannot determine that these plaintiffs were suspended or expelled for some violation other than the violation against hazardous oversize trousers.
The court cannot simply guess or assume that the conduct that led to suspension of these students was the wearing of some item that the court has not yet ruled to be a permissible regulation of student conduct. As the United States Supreme Court has stated, "[i]n any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated." County of Sacramento v. Lewis,523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). These plaintiffs have failed to sustain their burden of proving what their conduct was. Do they claim a constitutional right to wear gang colors in a public school? Do they claim a constitutional right to carry a laser pen or to wear high heeled sandals that cause them to slip on the stairs? Without evidence of the conduct at issue having been presented during the trial on the merits, this court lacks any means to analyze the claims made and has no basis for determining whether the policy that exposed that conduct to sanctions violated a constitutional protection of that conduct.
Minor plaintiffs Johnson, Layton and Scarduzio have failed to present evidence necessary to allow adjudication of their claims. CT Page 15648
Claims of Teshana Byars
Teshana Byars claims that she has a right under the state and federal constitutions to wear blue jeans to public school. Because she did not prove that she was suspended for any other violation of the school attire policy, the only feature of the dress code that is actually before this court is the sole provision that the evidence suggests she violated, that is, the prohibition against wearing blue jeans.
Blue jeans are a prohibited item of apparel for both middle school and high school students in the regular school programs in Waterbury. Byars has not claimed that she favors wearing blue jeans because of any expressive or political impetus, or that affordability, religion or health are the reason for her preference for blue jeans; rather her position, as stated in her complaint and as articulated by her mother, Arline Stephenson, is that she simply likes to wear blue jeans and wishes to dress as she pleases when she attends public school. Byars has been home-schooled since the 1999-2000 school year. She is now eligible for public education at the high school level, which in Waterbury encompasses grades nine through twelve, and she is subject to the prohibition against wearing blue jeans so long as she qualifies for education at the regular public high schools. As she was informed when she was expelled in July 1999, she had the option for the year of her expulsion, 1999-2000, of attending the Enlightenment Academy, an alternative school within the Waterbury Public Schools which is not subject to the dress code and where blue jeans are not prohibited. Because the term of her expulsion is over, she is free to attend a regular public high school in the Waterbury school system; however, if she does so, she will be subject to the dress code prohibition against wearing blue jeans.
a. Federal Constitutional Claims
Ms. Byars alleges that the maintenance and enforcement of the dress code prohibition against wearing blue jeans violates her rights of liberty and privacy protected by the due process clause of theFourteenth
Amendment to the United States Constitution. The Supreme Court has ruled that "[i]n any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated."County of Sacramento v. Lewis, supra, 523 U.S. 841 n. 5, citing Graham v.Connor, 490 U.S. 386, 394, 104 L.Ed.2d 443, 109 S.Ct. 1865 (1989). The Supreme Court found in City of Sacramento that the right being asserted by the plaintiff in that case was a right not to be harmed during a police pursuit, not the general right not to be deprived of liberty. The Court rejected the plaintiff's claim for compensation based on such specific liberty interest alleged. CT Page 15649
Ms. Byars alleges a right not to be deprived of liberty, but the "exact contour" of the right she claims is a right not to be prohibited from wearing blue jeans to school. Her reliance on cases involving regulation of bodily integrity, such as Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705,35 L.Ed.2d 147, rehearing denied, 410 U.S. 959 (1973); and Griswold v.Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), is inapposite. The regulation at issue does not deprive her of control of her reproductive functions or any other kind of bodily integrity.
Ms. Byars bases her claim on the Fourteenth Amendment's prohibition against actions which, in substance, rather than by procedure, constitute a denial of due process of law.
"Substantive due process" as this construction of theFourteenth
Amendment has come to be known, does not, however, bar all governmental regulations that may limit a plaintiff's liberty. Rather, such claims are examined with different standards of scrutiny depending on the right at issue.
When the right infringed is "fundamental" the governmental regulations must be "narrowly tailored to serve a compelling state interest." Renov. Flores, 507 U.S. 292, 302, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1
(1993). Rights are fundamental if they are "implicit in the concept of ordered liberty," Palko v. Connecticut, 302 U.S. 319, 325-26,58 S.Ct. 149, 152, 82 L.Ed.2d 288 (1937), or "deeply rooted in this nation's history and tradition." Moore v. East Cleveland, 431 U.S. 494, 523,97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977). Where the claimed right is not fundamental, the governmental regulation need only be rationally or reasonably related to a legitimate state objective. Reno v. Flores,
supra, 507 U.S. 303-306.
As has been mentioned above, the Supreme Court approved in Tinker v.Des Moines School Dist., supra, 393 U.S. 503, the authority of school officials to regulate dress and conduct of students, so long as specific fundamental constitutional rights, such as the right to engage in political speech, were not subjected to unjustified regulation. SinceTinker, federal trial courts have decided other cases concerning the attire, appearance, and activities of students in public schools. The federal courts have adhered to the approach set forth in Tinker: claims of violation of fundamental rights such as the right to freedom of expression must be strictly scrutinized; East Hartford EducationAssociation v. Board of Education, 562 F.2d 838 (2d Cir. 1977); however, general claims of loss of liberty in choice of activities or options are valid if rationally related to a governmental objective. Immediato v. RyeNeck School District, supra, 73 F.3d 462. CT Page 15650
The plaintiffs cite cases in which several courts ruling in the late 1960's and early 1970's invalidated school requirements that students cut their hair. These cases are not on point. Requirements to cut hair involve a student's bodily integrity and require a change to a body part that affects the student when he or she is not in school. As Chief Judge Motz of the federal district court of the district of Maryland cogently observed in Isaacs v. Board of Education of Howard County,40 F. Sup.2d 335, 339 (D. Md. 4th Cir. 1999), a case in which a public school student claimed that her liberty interest was infringed by a school rule prohibiting the wearing of hats or head covering to school other than for religious reasons, there is a difference between regulations requiring alterations to the body, such as requirements to cut hair or shave off beards, and regulations concerning clothing, which do not alter the student's chosen appearance outside of school hours. The former kind of regulations affect a student's right to bodily integrity; the latter do not. The higher standard imposed by some courts on school regulations that impinge on bodily integrity do not apply to the prohibition against wearing blue jeans to school. As the findings of fact set forth above demonstrate, the decision to prohibit blue jeans is rationally related to the goal of reducing disruption, taunting, theft, and loss of attention to course work.
The plaintiffs presented testimony to the effect that the school dress codes had not produced a statistically significant improvement in scores on standardized tests or on the overall numbers of disciplinary cases. The plaintiffs apparently undertook this proof because in cases in whichFirst Amendment Claims were raised, a court noted that a regulation did not "measurably contribute to the maintenance or order and decorum within the school system." Burnside v. Byars, 363 F.2d 744, 748 (5th Cir. 1966).
The Burnside court did not construe the requirement that a rule be "reasonable" as requiring that it satisfy statistical methodology for demonstrating statistically significant correlations between a policy and the desired outcome. Where the rational relation test applies, the inquiry is whether the challenged rule or policy bears a rational relation to the aim of the school district, not whether it can be demonstrated to have a statistically significant correlation to achievement of that aim. Immediato v. Rye Neck School District, supra, 73 F.3d 462.
The United States Supreme Court has rejected any requirement that legislation be supported to the level required by standards of scientific validity in order to be permissible. In Ginsberg v. New York, 390 U.S. 629,642-43, 88 S.Ct. 1274 20 L.Ed.2d 195 (1968), the Court stated "we do not demand of legislatures `scientifically certain criteria of CT Page 15651 legislation.'"
While regulations limiting expression or invading bodily integrity have been disapproved where the justification is merely some hypothetical disruption that may be caused, see East Hartford Education Associationv. Board of Education, supra, 562 F.2d 838; Crossen v. Fatsi,309 F. Sup. 114, 118 (D.Conn. 1970), the defendants in the case before this court showed actual disruptions caused by reactions to bluejeans, including theft and time-consuming distractions and disputes arising from taunts or envy. The prohibition is rationally related to eliminating disruption from this source.
The plaintiffs also rely on comments concerning the extent of proof necessary to justify a regulation that the court found to impinge a fundamental right in Nunez v. San Diego, 114 F.3d 935 (9th Cir. 1997). This court has found that there is no fundamental right to wear blue jeans to school, and that only the rational relation test applies to the challenged regulation. The observations of the court in applying a strict scrutiny standard in Nunez do not apply where, as here, the right at issue is not fundamental. In such a situation, the regulation is valid if rationally related to its goal.
Claims under State Constitution
The only claim based on the state constitution that the plaintiffs here briefed is plaintiff Teshana Byars' claim that the enforcement of the school dress code has violated her right to a free public education. Article Eighth, § 1 of the Connecticut constitution provides that "there shall always be free public elementary and secondary schools in the state."
The defendants have not contested that such claims may be raised by a direct action under the State constitution.
In 1996, the General Assembly enacted Conn. Gen. Stat. § 10-221f, which provides that "[a] local or regional board of education may specify a school uniform for students in schools under its jurisdiction." More generally, Conn. Gen. Stat. § 10-220 provides that each board of education "shall provide an appropriate learning environment for its students." Conn. Gen. Stat. § 10-233d(a) authorizes boards of education to suspend and expel "any pupil whose conduct on school grounds or at a school-sponsored activity is violative of a publicized policy of such board . . ."
Plaintiff Teshana Byars violated the duly enacted school dress code on multiple occasions. She makes no claim that the board of education failed CT Page 15652 to provide her with a hearing as required by Conn. Gen. Stat. §10-233d, nor that the board failed to offer her an alternative educational placement as § 10-233d(d) requires. Her claim is quite simply that she is deprived of a public education if she is required to obey a school rule with which she does not agree.
The Connecticut Supreme Court has issued no ruling that even remotely supports the proposition that enforcement of a school rule authorized by the legislature that infringes no fundamental right constitutes a violation of the right to a free public education, and this court doubts that it ever will.
The facts presented at trial establish that the defendants provided Teshana Byars with an educational placement at an alternative public school, that the dress code has not been enacted for use at that school, and that her parents decided to home school her instead. Her expulsion from the regular schools has expired by its own terms, and she is free to return to the public high school for the current school year.
Ms. Byars asks this court to equate the enforcement of a school regulation that has been shown to be rationally related to the purpose of reducing disruptions, arguments, thefts, and loss of instructional time with a deprivation of a free public education. Such a conclusion cannot be made on the evident presented.
All the plaintiffs have failed to prove that the defendants have violated Article Eighth, § 1 of the state constitution.
Other Claims
The plaintiff has not briefed her claims of violation of other provisions of the state constitution.
These claims are therefore treated as abandoned. State v. Smith,255 Conn. 830, 835 n. 12 (2001); State v. Robinson, 227 Conn. 711, 721-22
(1993); Cannata v. Dept. of Environmental Protection, 215 Conn. 616, 620
n. 6 (1990); Rodriquez v. Mallory Battery Co., 188 Conn. 145, 149 (1982).
Parental Authority
The parents and guardians of plaintiffs Johnson, Layton and Scarduzio have likewise failed to discharge their burden of proving the facts necessary to adjudicate their claim. They assert violation of their right of parental autonomy to determine what clothing their children may wear to school. Plaintiffs Dennis Byars and Arline Stephenson, the parents of plaintiff Teshana Byars, have presented evidence that they permit their CT Page 15653 daughter to wear blue jeans and believe that their permission should be sufficient to allow her to wear blue jeans to school.
Recognition of parental autonomy in important decisions concerning the rearing of their children has never been held to entitle parents to suspend all rules imposed by social institutions if those rules are at odds with the parents' preferences. The plaintiffs assert that the Supreme Court's decision in Troxel v. Granville, 530 U.S. 57,120 S.Ct. 2054,147 L.Ed.2d 49 (2000), establishes an absolute right of parents to make all decisions concerning their children without any intrusion by governmental regulations. The Supreme Court issued no such sweeping fiat. The Court found in Troxel, rather, that parents had a fundamental right to bring up their own children and could not be required by the state to permit other persons to visit their children because of a determination by a state agency that such visits would benefit the children. Troxel involved no ruling concerning the right of parents to enact or abrogate rules imposed in public schools to reduce disruptions, to protect other students from taunting and loss of property, and to diminish loss of instructional time.
The characterization of a right as "fundamental" does not mean, as the plaintiffs assert, that the right is absolute. Such "fundamental" rights as the right to freedom of association are nevertheless not absolute
rights, but are subject to restrictions as to time, place and manner.Buckley v. Valeo, 424 U.S. 1, 25, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976);Chaplinsky v. New Hampshire, 315 U.S. 568, 571 (1942).
The Supreme Court has recognized that parents have a fundamental right to educate their children in schools with different curriculums than the public schools, see Wisconsin v. Yoder, 406 U.S. 205, 220-21,67 L.Ed. 1042,92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); Meyer v. Nebraska, 268 U.S. 510,534-35; 45 S.Ct. 571, 69 L.Ed. 1042 (1925). The Court did not in Troxel
and has not in any other case recognized a parental right to send children to public schools yet decide which, if any, of the school's regulations would apply to their children.
The absolute right of parental autonomy that the plaintiff parents favor is totally unworkable in a multi-cultural community whose members hold a wide variety of beliefs concerning parenting and education. If, as the plaintiff parents assert, parents are constitutionally entitled to have no restrictions whatever placed on their children while they attend public schools, or to have their children be subject only to those school rules with which the parents concur, it would be impossible for school districts to prohibit guns in school, require students to attend for a particular number of hours or days, set a school calendar, or require students to study particular core subjects. Absolute exercise of parental CT Page 15654 autonomy within the public school program would very likely cause total chaos as conflicting parental visions collided. No court has given the concept of parental autonomy the sweep advocated by the plaintiffs.
The Supreme Court has cautioned that in analyzing of a claimed violation of a constitutional right, "the first step is to identify the exact contours of the underlying right said to have been violated."County of Sacramento v. Lewis, supra, 523 U.S. 841, n. 5. By "exact contours," the Court cannot be understood to mean the general rubric, such as "due process" or "parental autonomy," but the precise conduct or entitlement at issue. In Wisconsin v. Yoder, supra, 406 U.S. 204, the exact contour of the claimed right of parental autonomy was the right to religious observance and practice, a specific right protected by theFirst Amendment. In Meyer v. Nebraska, supra, 268 U.S. 510, it was the right to have students learn foreign languages. In this case, the exact contour of the parents' claim is a right to allow their daughter to wear blue jeans to school, a preference which has obviously not been shown to proceed from any specific constitutional entitlement.
In Tinker v. Des Moines School District, 393 U.S. 503, 507,89 S.Ct. 733,21 L.Ed.2d 731 (1969), the Supreme Court differentiated between school rules governing "type of clothing . . . or deportment" and those regulating political expression in school. Recognizing its prior ruling in Meyer v. Nebraska, supra, the Court noted in Tinker that it "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." Id. Since Ms. Byars' parents do not claim any religious, expressive or political content to the wearing of blue jeans, the right asserted is limited to a claim of a right to engage in particular conduct that is prohibited under school rules.
The governmental intrusion at issue in Troxel v. Granville, supra,530 U.S. 57 was the surrendering of control of the family's privacy and control of its own time and activities by requiring the family to submit to the intrusions of others merely because those others desired a role. The Supreme Court had no occasion to rule in that case on any regulation that applied in any public institution. The specific issue of parental authority found to be fundamental in Troxel provides no controlling precedent for the very different situation at issue in this case.
The Supreme Court has signaled no departure from its recognition inTinker v. Des Moines School Dist., 393 U.S. 503, of the ability of school officials to enact rules of conduct that do not trammel such specific rights as the freedom to engage in political expression or the right to religious observance. The absolute, unfettered liberty from regulation of CT Page 15655 their children that the parent plaintiffs claim has not been recognized in the opinions on which they rely, and their claim pursuant to § 1983 must therefore fail.
Courts have repeatedly held that parental rights are not absolute in the public school context and can be subject to regulations rationally related to a legitimate purpose. See, e.g., Runyon v. McCrary,427 U.S. 160, 177, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (recognizing no parental right to educate children in private segregated academies); see also Swanson v. Guthrie Independent School District, 135 F.3d 694, 698
(10th Cir. 1998) (recognizing that case law on this subject establish that "parents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject"). The ruling in Troxel v. Granville, supra,530 U.S. 57, included no retreat from these rulings. Like other rights found to be fundamental, the right of parental autonomy does not trump all other social interests in every context.
Federal courts addressing the issue have held that parents have no right to exempt their children from certain reading programs the parents found objectionable, or from a school's community-service requirement, or from an assembly program that included sexually explicit topics.Immediato v. Rye Neck School District, 73 F.3d 454 (2d Cir.), cert. denied, 519 U.S. 813, 117 S.Ct. 60, 136 L.Ed.2d 22 (1996); Brown v. Hot,Sexy, and Safer Productions, Inc., 68 F.3d 525 (1st Cir. 1995), cert. denied, 516 U.S. 1159, 116 S.Ct. 1044, 134 L.Ed.2d 191 (1996);Fleischfresser v. Directors of School Dist. 200, 15 F.3d 680 (7th Cir. 1994); Mozert v. Hawkins County Board of Education, 827 F.2d 1058 (6th Cir. 1987), cert. denied, 484 U.S. 1066, 108 S.Ct. 1029, 98 L.Ed.2d 993
(1988).
Recently, in Littlefield v. Forney Independent School District,
United States Court of Appeals, Docket No. 00-10965 (5th Cir. October 17, 2001), the court of appeals for the fifth circuit ruled that the rational relation test applies to a claim of violation of parental authority occasioned by a public school dress code. See also Herndon v. ChapelHill-Cairboro City Board of Education, 89 F.3d 174, 177-79 (4th Cir.), cert. denied, 519 U.S. 1111, 117 S.Ct. 949, 136 L.Ed.2d 837 (1996) (due process claims involving parental rights in the public school context are to be judged on a rational relation standard).
Conclusion
The plaintiffs have not claimed that the school dress code at issue violated any right to freedom of speech or expression, and the court makes no finding in this regard. CT Page 15656
The claims of all plaintiffs for injunctive relief concerning the maintenance and enforcement of the school dress code in the middle schools of Waterbury are moot because the plaintiffs are now in the grades subject to the rules applicable to the high schools and are no longer subject to rules applicable to the middle schools.
The plaintiffs have failed to prove their other claims, as the school dress code policy was demonstrated to be rationally related to reducing actual disruptions and loss of instructional time caused by students' preoccupations with fashionable clothing, including blue jeans.
Judgment shall enter in favor of the defendants as to all of the plaintiffs' claims.
 Beverly J. Hodgson Judge of the Superior Court
 APPENDIX A ARTICLE FIVE SCHOOL ATTIRE
The Board of Education has determined that reasonable regulation of school attire can further important educational interests including:
(1) Reducing distraction and loss of self-esteem caused by teasing or competition over clothing;
(2) Providing an environment where students can focus more on learning;
(3) Enhancing school safety by making it harder to conceal weapons or contraband;
(4) Reducing the cost of school clothing;
(5) Creating a greater sense of community amongst the students;
(6) Preparing students for the future roles in the professional workplace;
(7) Creating an atmosphere reflecting seriousness of purpose about education; and
(8) Minimizing disruption from wearing inappropriate clothing or possessing inappropriate items at school. CT Page 15657
It is the responsibility of parents to ensure that their childrens' dress conforms to requirements set forth below. The health, safety and education of the child must be the concern of every parent/guardian. It is the recommendation of professional school personnel that parents/guardians hold their children to the highest standard in regards to school attire.
5.1 MANDATORY UNIFORM POLICY FOR THE MIDDLE AND ELEMENTARY SCHOOLS: The following Uniform Policy is mandatory for the elementary and middle schools. The purpose of this policy is to further the important educational interests identified above.
BOYS:
 5.1.1 Pants, shorts (colors: solid navy blue, black, gray, or khaki) — must be "dress" or "docker" style pants or knee length shorts — worn or belted at the waist.
 5.1.2 Tops (colors: solid white or light blue) — must be oxford, polo, or turtleneck style with sleeves (short or long) and collar. Must be tucked into the pants/shorts at all times. Individual schools may choose a third color from the following: solid yellow, pink, navy blue or black. Please contact the individual school for their choice.
 5.1.3 Optional — sweater (v-neck or cardigan), blazer, suit jacket or vest — worn over top (color: solid navy blue, white gray or same color as top)
GIRLS:
 5.1.4 Jumpers, skirts, dresses, pants, shorts, skorts (colors: solid navy blue, black, gray or khaki) — must be "dress" or "docker" style pants or knee length shorts. Pants, shorts, skirts and skorts must be worn or belted at waist.
 5.1.5 Tops (colors: solid white or light blue) — must be oxford, polo or turtleneck style with sleeves (short or long) and collar. Must cover waistline when arms are raised. Individual schools may choose a third color from the following: solid yellow, pink, navy blue or black. Please contact individual school for their choice.
 5.1.6 Optional — sweater (v-neck or cardigan), blazer, suit jacket or vest — worn over top (color: solid navy blue, white, gray or same color as top) CT Page 15658
5.1.7 Footwear (Boys and Girls):
 1. Shoes are strongly recommended. In addition to shoes, white or black sneakers are permitted. Laces on shoes or sneakers must be tied.
2. Sandals or bare feet are not permitted.
 5.1.8 Gym Day Attire (Boys and Girls): Elementary school students may wear sweats to school on scheduled gym day. Sweats must be solid navy blue, white, gray or school color choice. Middle school students must bring gym clothing to change into for physical education classes.
5.2 MANDATORY ATTIRE POLICY FOR THE HIGH SCHOOL: The following attire is mandatory for Waterbury High School students:
5.2.1 Bottoms:
 Boys: Dress or docker style pants or knee length shorts or "dress" non-blue (i.e. black, wheat) jean pants or knee length shorts.
 Girls: Dress or docker style pants, dresses, jumpers, skirts, skorts or knee length shorts or "dress" non-blue (i.e. black, wheat) jean pants or knee length shorts. Pants, skirts, skorts, shorts must be worn or belted at waist. Short shorts (defined as gym length or less) are not permitted.
5.2.2 Tops:
 Boys: Dress shirt, oxford, polo, turtleneck or sweater style with short or long sleeves. Shirts to be tucked into pants/shorts at all times.
 Girls: Blouse, dress shirt, oxford, polo, turtleneck or sweater style with short or long sleeves, must be worn to waistline when arms are raised.
5.3 PRE-K THROUGH 12 DRESS CODE:
 5.3.1 The following are prohibited for all students to wear during the school day:
1. Pants or shorts of sweat, spandex, or blue jean material;
 2. Tank tops, undershirts or underpants worn as outer garments, halter tops, tube tops, bare midriffs, transparent clothing, hooded CT Page 15659 shirts and clothing with plunging necklines (front or back);
3. Clothes which are torn, ragged or have holes;
4. Skirts, shorts, dresses, and jumpers shorter than knee length;
 5. Outer coats, windbreakers, hats, visors, scarves, earmuffs, bandannas, curlers, goggles, and sunglasses;
 6. Beepers, walkman-type players, cellphones, laser pens and other types of electronic devices which are not prescribed for instructional purposes;
 7. Footwear which causes noisy distraction or which is unsafe or a health hazard;
8. Jewelry or chains of any kind that could be dangerous; and
9. Clothing or items indicating current gang affiliation.
 5.3.2 Books bags/Gym bags: Students may bring books, school materials and gym clothing to school only in clear plastic bags, clear book bags, or clear gym bags.
5.4 SCHOOL PERSONNEL: School personnel, including substitutes, should serve as role models for proper attire in the educational setting.
5.5 RELIGIOUS AND HEALTH ACCOMMODATIONS: Where the bona fide religious beliefs or health needs of a student conflict with the school attire policy, the schools will provide reasonable accommodation. Any student desiring accommodation shall notify their school principal in writing of the requested accommodation and the factual basis for the request. Approved coverings worn as part of a student's bona fide religious practices or beliefs shall not be prohibited under this policy.
5.6 CLOTHING ASSISTANCE: It is the policy of the Board of Education that no student will be denied an education due to bona fide financial inability to obtain clothing that complies with the School Attire Policy. Any student for whom compliance with the school attire policy poses a bona fide financial burden, may submit a written request for clothing assistance to their school principal specifying the clothing needed together with a statement of financial need. School principals or their designees shall assist families in financial need to obtain clothing that complies with the school attire policy. In meeting requests for assistance, principals or their designees shall consider community resources such as clothing donations from school personnel, merchants, CT Page 15660 parent organizations, and charitable organizations, financial assistance, purchasing clothing for a student, and providing additional time for a student to obtain clothing that complies with the School Attire Policy.
The Board of Education has authorized school principals, where other resources or accommodations are inadequate, to expend Student Emergency Expenditure Funds and Student Activity Funds for the purchase of clothing supplies for students with bona fide financial need.
5.7 ACCOMMODATION OF FREE EXPRESSION: An item of approved clothing containing an expressive message is permitted. For example, a button supporting a political candidate may be worn. However, expressive items are prohibited if, in the reasonable judgment of school officials, they may tend to disrupt or interfere with educational interests. For example, racist messages, gang insignia, messages promoting drug or alcohol abuse, and profane or pornographic messages or illustrations are prohibited. Also prohibited during the school day are items of clothing that undermine the integrity of required attire, such as a windbreaker that contains expressive writing.
5.8 ADMINISTRATIVE REVIEW: Any student who believes that their school has not reasonably accommodated his or her bona fide religious, health or financial needs or right of free expression, may submit a written request for review to the Waterbury Board of Education. The Board of Education, or its designee, will review the mater and respond in writing to the student's concerns.
5.9 COMPLIANCE: School administrators and teachers are encouraged to use positive reinforcement to obtain compliance with school attire requirements. However, when a student fails to comply with the school attire policy, discipline is appropriate. The following discipline procedures shall apply.
High Schools: First Offense: Removal from class with a chance to correct and return to class. If not corrected, in school suspension and notification to parent or guardian.
 Second Offense: In school suspension and after school detention.
 *Third and subsequent Offenses: One day out-of-school CT Page 15661 suspension.
Middle Schools: First Offense: Written warning and notification to parent or guardian.
Second Offense: After school detention.
 *Third and Subsequent Offenses: One day out-of-school suspension.
Elementary Schools: First Offense: Verbal counseling.
 Second Offense: Written warning and notification to parent or guardian.
 Third and Subsequent Offense: Participation in one recess period withheld.